## IN RE JORDEN R.■
### (SC 18169)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and McLachlan, Js.

---

Argued March 24—officially released October 6, 2009

*Susan T. Pearlman*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellant (petitioner).

*Michael J. Melly*, for the appellee (respondent mother).

*Karen Oliver Damboise*, for the minor child.

*Opinion*

ROGERS, C. J. The primary issue in this case is whether, in termination proceedings under General

Statutes (Rev. to 2005) § 17a-112 (j),[1] a trial court can find that a parent is unwilling or unable to benefit from reunification services without first finding that reasonable efforts were made to reunify the parent with her child. The petitioner, the commissioner of children and families (commissioner), appeals from the judgment of the Appellate Court reversing the trial court's judgment terminating the respondent mother's parental rights with respect to her infant son, Jorden R. *In re Jorden R.*, 107 Conn. App. 12, 36, 944 A.2d 402 (2008). The

---

[1] General Statutes (Rev. to 2005) § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to . . . section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that . . . (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

General Statutes (Rev. to 2005) § 17a-111b (a) provides in relevant part: "The Commissioner of Children and Families . . . may . . . petition the court for a determination on whether reasonable efforts to reunify the parent with the child are appropriate. . . . The court may determine that such efforts are not appropriate if the court finds upon clear and convincing evidence that: (1) The parent has subjected the child to the following aggravated circumstances . . . (B) the parent has inflicted . . . severe physical abuse on the child . . . ."

Because §§ 17a-112 (j) and 17a-111b were amended in 2006; see Public Acts, No. 06-102, §§ 6, 7 and 8; and those amendments did not take effect until after the trial court had issued its memorandum of decision in this case, all references in this opinion to §§ 17a-112 (j) and 17a-111b are to the 2005 revision of the statutes. We emphasize, however, that because the language at issue in this appeal was largely unaffected by the 2006 amendments, our analysis under the 2005 revision applies to the current statutory revision as well.

commissioner claims that the Appellate Court improperly: (1) interpreted § 17a-112 (j) (1) to require the department of children and families (department) to prove that it made reasonable efforts to reunify a family before a court can find that a parent is unable or unwilling to benefit from reunification services; (2) substituted its judgment for the trial court's in overruling the trial court's finding that the respondent was unable or unwilling to benefit from reunification services; and (3) concluded that the trial court abused its discretion in excluding from evidence a psychological evaluation of the respondent. We agree with the commissioner and, accordingly, reverse in part and vacate in part the judgment of the Appellate Court.

The record reveals the following procedural history. On July 27, 2005, the commissioner filed a neglect petition on behalf of Jorden. See General Statutes § 46b-129 (a). On that same date the trial court granted an ex parte order of temporary custody after finding that Jorden was suffering from serious physical injury and illness, was in immediate physical danger from his surroundings, and that continuation in those surroundings was contrary to his welfare. On October 27, 2005, the commissioner filed a petition to terminate the parental rights of the respondent and Jorden's father. The neglect and termination petitions later were consolidated and tried together. At the end of the trial, the father consented to the termination of his parental rights. On September 26, 2006, the trial court granted the termination petition and terminated the parental rights of both parents. The respondent thereafter appealed from the judgment of the trial court.[2] On April 15, 2008, the Appellate Court reversed in part the trial

[2] Although the father also was a respondent to the commissioner's petition for termination of parental rights, he has not appealed from the trial court's judgment. Accordingly, we refer in this opinion to the mother alone as the respondent.

court's judgment and remanded the case for a new trial. Id. This court then granted the commissioner's petition for certification to appeal. *In re Jorden R.*, 287 Conn. 921, 951 A.2d 569 (2008).

The following facts, which were found by the trial court or were not contested, are relevant to this appeal. The respondent delivered Jorden, a healthy male child, on June 19, 2005. The respondent was sixteen years old and the father was twenty years old at the time of Jorden's birth. A mere five weeks later, on July 24, 2005, Jorden suffered life-threatening and life-altering injuries, which necessitated the department's involvement in this case. Jorden was admitted to Windham Hospital (hospital) with a skull fracture, head bruising and swelling, a clavicle fracture and anterior chest trauma. Jorden's injuries left him substantially neurologically impaired and placed him at high risk for future developmental problems.[3] The hospital staff reported to the department and to the state police that Jorden appeared to have been severely abused.

The department and the state police began investigating Jorden's injuries as an abuse case. The investigations confirmed that Jorden had been abused, but failed to determine conclusively which parent had caused his injuries. Neither parent ever provided an adequate explanation for how he had sustained his injuries. Each parent denied causing the injuries and specifically implicated the other as the abuser.[4]

---

[3] When he was discharged from the hospital on August 8, 2005, Jorden's injuries were severe enough to require his placement in a medically complex foster home and two subsequent neurological procedures. On September 21, 2005, Jorden had bilateral burr holes created in his head to drain hematomas. On November 7, 2005, a ventricular peritoneal shunt was surgically implanted in his brain. The trial court noted that due to his special needs resulting from his prodigious medical issues, Jorden will require consistent, stable and mature care throughout his life.

[4] The father suggested that the respondent likely had dropped Jorden accidentally. Conversely, the respondent testified that she "knew [she] didn't do it and the only person that could have done it was [the father]." Further,

Jorden's injuries occurred at some point during the night of July 23, 2005, when he was in the exclusive care of his parents. Earlier that day, the father and the respondent, who at the time were living together in the home of the respondent's parents, left Jorden with the respondent's mother while they attended a party where they drank alcohol and smoked marijuana. After the party, at approximately 11 p.m., the couple picked up Jorden and proceeded to the home of the father's grand-mother to spend the night. Upon arriving at the grand-mother's house, the respondent prepared Jorden's formula, took it to the room in the basement in which they were staying and went to sleep. At that point, Jorden appeared normal. The respondent also did not notice anything unusual about Jorden when she woke to feed and change him at approximately 2 a.m.

At approximately 10 a.m. the next day, while the respondent was feeding Jorden, she noticed that his hand twitched at ten to fifteen second intervals. She identified the twitching as a cause for concern and telephoned her mother for advice. The respondent called her mother multiple times because the twitching continued throughout the day. The respondent and her mother eventually agreed to meet for dinner, at which time they would evaluate Jorden.

When the father and the respondent brought Jorden to the respondent's parents' home at approximately 7 p.m., Jorden was twitching actively. The respondent's mother inspected Jorden, noticed swelling in the region of his right temple, and told the parents to take Jorden to the emergency room at the hospital. The respondent and the father complied and brought Jorden to the emergency room—ten hours after the respondent first noticed the twitching. There was testimony at trial that

---

both parents gave investigators incomplete, misleading and false accounts of their relationship and the events surrounding Jorden's injuries.

this delay likely compromised Jorden's medical treatment.

Immediately after the couple arrived at the hospital with Jorden, an emergency room nurse realized the baby was having seizures and called for a physician, who observed that Jorden was suffering from clonic tonic seizures, facial and body twitching and eye deviation. Jorden's seizures were related to intracranial injuries, which, according to the medical staff treating him, likely had occurred within the previous twenty-four to forty-eight hours. A hospital emergency room physician opined at trial that Jorden's symptoms were consistent with shaken baby syndrome. The physician stated that Jorden's internal head injuries had occurred either from a blow to the head or from having been severely shaken and that the bruise was the "result of a blow." The physician further noted that the skull and clavicle fractures, coupled with the unexplained mechanics of the injury, were "all red flags for abuse and nonaccidental trauma."

Jorden's injuries were so severe that he was flown by helicopter to Hartford Hospital and then transferred to the Connecticut Children's Medical Center (medical center). Aaron Zucker, the director of the pediatric intensive care unit at the medical center, diagnosed Jorden with a compound skull fracture, subdural hematomas with severe brain dysfunction, early brain swelling and a broken right clavicle. Carol Leicher, a pediatric neurologist at the medical center, testified that Jorden's injuries were the result of intentionally inflicted blunt force trauma. She also concluded that Jorden's injuries were consistent with more than one trauma because one hematoma had the characteristics of fresh blood and the other hematoma showed hemoglobin, indicating that the injuries could not have occurred at the same time and that Jorden had been abused on multiple occasions.

While he remained hospitalized at the medical center, Jorden's condition continued to worsen. Repeated brain scans showed rapidly increasing swelling and worsening of the subdural effusion. An ophthalmologist documented retinal hemorrhages in Jorden's left eye. With the consent of the father and the respondent, the hospital issued a do not resuscitate order for Jorden.

The commissioner subsequently filed the neglect petition and sought temporary custody of Jorden, citing his severe and unexplained physical injuries. See General Statutes § 46b-129 (b). In connection with its order granting temporary custody of Jorden to the commissioner, the trial court ordered, and the department thereafter provided to the parents, specific steps to facilitate reunification. See General Statutes § 46b-129 (d) (6).[5] Those steps called for the respondent, inter alia, to "[p]articipate in counseling and make progress toward . . . identified treatment goals . . . ." One of those goals was for the respondent to deal with issues such as her own history of abuse by the father and his probable battery of their child. Another specific step called for the respondent to "[o]btain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by [the department] to avoid further domestic violence incidents." Although the respondent facially complied with most of these specific steps, she seriously undermined their overall purpose by maintaining a clandestine relationship with the father, which she hid from her parents, department social workers and her therapist. Moreover, the respondent failed to obtain a protective order against the father

[5] Pursuant to § 46b-129 (d) (6), a trial court, after a preliminary hearing on an order for temporary custody or the first hearing on a neglect petition, "shall order specific steps the commissioner and the parent or guardian shall take for the parent or guardian to regain or to retain custody of the child or youth . . . ."

until May 17, 2006, a full eleven months after Jorden's injury and hospitalization.[6]

The trial court's factual findings demonstrate that the respondent's relationship with the father had been volatile throughout its course. The couple argued frequently and sometimes violently, most often about the father's drug use and sexual relations with other girlfriends. The couple also endured a number of temporary breakups during the course of their rocky relationship. As a result of the father's extreme negative reaction to the respondent's pregnancy, the couple stopped seeing each other for several months. They later reconciled, however, and resumed their relationship, despite the respondent's concern that the father was using cocaine.

The respondent also had witnessed the father being aggressive toward Jorden prior to the infliction of the catastrophic injuries at issue in this case. The respondent told a court-appointed evaluator that she saw the father apparently squeezing Jorden's head on several occasions, being rough with Jorden at night and closing the door when he was alone with Jorden. She claimed to have heard sounds that indicated that the father was trying to smother Jorden, after which Jorden's crying stopped abruptly. The respondent also claimed to have run into a room once to confront the father and tell him that he should stop doing that. Still, she continued to allow the father to be alone with Jorden.

Despite the father's aggressive and abusive behavior and the couple's multiple breakups, the respondent was vulnerable to the father's "sweet talk" and repeatedly reconciled with him. Indeed, the respondent and the

---

[6] The respondent ultimately complied with the step of obtaining a protective order after the father barged into her home, struck her and knocked her to the ground and prevented her from calling the police. It was not until the father's arrest for this incident that the respondent finally terminated her relationship with him.

father broke up for a brief period following Jorden's injuries. The respondent eventually took the father back, however, even though she suspected that he was Jorden's abuser and even though it was contrary to the court-ordered specific steps.

Notwithstanding the fact that reunification efforts were underway pursuant to the specific steps ordered by the court in connection with the order of temporary custody, the commissioner, on October 27, 2005, filed a petition to terminate parental rights, which stated that the respondent and the father were unable or unwilling to benefit from reunification efforts. Specifically, the petition relied on the fact that Jorden had suffered serious physical injuries while he was in his parents' care and while they were intoxicated and because, three months later, they still had not provided a viable explanation for those injuries. Following a trial, the court terminated the rights of both parents pursuant to § 17a-112 (j). Pursuant to the statute, the trial court found that the department had made reasonable efforts to reunify Jorden with both of his parents.[7] The trial court also found, however, that the respondent was unwilling or unable to benefit from reunification efforts. The trial court additionally found that termination of the parents' rights was in Jorden's best interest. Finally, the trial court found that Jorden had been denied, by acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being, on the basis of his severe, life-threatening and unexplained nonaccidental injuries resulting in permanent neurological impairment. The

---

[7] The court found: "Without in any way attempting to provide an exhaustive list, [the department] has provided therapeutic foster care for Jorden, respite care, mental evaluations of the parents, supervised visitation, services [from the Birth to Three Program] for Jorden, substance abuse evaluations and treatment, individual counseling, anger management counseling, and parenting counseling."

respondent appealed from the trial court's judgment to the Appellate Court.[8]

The Appellate Court reversed in part the trial court's judgment and remanded the matter for a new trial, concluding that the trial court improperly had found that the respondent was unable or unwilling to benefit from reunification services and, further, improperly had excluded from evidence a report and testimony from the respondent's psychological evaluator.[9] *In re Jorden R.*, supra, 107 Conn. App. 28, 36. This certified appeal by the commissioner followed.[10]

I

The commissioner claims first that, under certain circumstances, § 17a-112 (j) (1) authorizes a trial court

[8] Specifically, the respondent claimed that the trial court improperly: (1) terminated her parental rights because (a) she did not act by commission or omission as contemplated by § 17a-112 (j) (3), (b) termination of parental rights was not in Jorden's best interest, and (c) she was able and willing to benefit from reunification services; (2) disallowed her expert from testifying; and (3) declined to transfer guardianship to the maternal grandparents.

[9] The Appellate Court also held that the trial court's finding as to § 17a-112 (j) (3) (C) was not clearly erroneous. *In re Jorden R.*, supra, 107 Conn. App. 18–19. Because the disposition of these claims provided sufficient grounds for reversal, the Appellate Court did not reach the respondent's claim that the trial court improperly had found that termination of her parental rights was in Jorden's best interest. Id., 18 n.4. Additionally, the Appellate Court declined to consider the respondent's final claim in regard to transfer of guardianship because that claim was briefed inadequately. Id., 14 n.2.

[10] On June 10, 2008, we granted the commissioner's petition for certification to appeal limited to the following issues: (1) "Did the Appellate Court improperly interpret . . . § 17a-112 to require the department . . . to prove it made reasonable efforts to reunify a family before a court can find a parent is unable or unwilling to benefit from services?"; (2) "Did the Appellate Court improperly substitute its judgment for the trial court's in overruling the trial court's finding that the respondent . . . was unable or unwilling to benefit from reunification services?"; and (3) "Did the Appellate Court [improperly] overrul[e] the trial court's decision to exclude a psychological evaluation of the respondent . . . ?" *In re Jorden R.*, supra, 287 Conn. 921.

to find that a parent is unwilling or unable to benefit from services without first finding that reasonable efforts were made to reunify the parent with her child. We agree.[11]

The Appellate Court, in considering whether the trial court properly had found that the respondent was unwilling or unable to benefit from reunification efforts, concluded its analysis with the following statement: "In the absence of any suggestion that the respondent intentionally caused those injuries, she was entitled to reasonable efforts of the department to aid her." *In re Jorden R.*, supra, 107 Conn. App. 28. The commissioner argues that the Appellate Court's conclusion improperly precludes the department from determining that a parent is unable or unwilling to benefit from reunification efforts without first having made those efforts.[12]

At the outset, we set forth the standard of review. Whether § 17a-112 (j) (1) requires the department to

---

[11] For the reasons expressed in part II of this opinion, the Appellate Court should not have addressed the question of what the department was required to do before determining that the respondent was unwilling or unable to benefit from reunification efforts because that question was, at that time, moot. The issue is not presently moot, however, because resolution of it in the commissioner's favor would afford the department practical relief. Specifically, a correct interpretation of § 17a-112 (j) (1) will relieve the department of the burden of providing services that are not legally mandated. Accordingly, we will consider this claim.

[12] According to the commissioner, the Appellate Court silently invoked § 17a-111b, which excuses the department from making reunification efforts when certain aggravated circumstances are present, among them, when a parent has "inflicted . . . severe physical abuse on [a] child"; General Statutes (Rev. to 2005) §17a-111b (a) (1) (B); see footnote 1 of this opinion; and concluded that these are the *only* circumstances under which reunification efforts are not required. See *In re Jorden R.*, supra, 107 Conn. App. 26–28. The respondent appears to agree generally with the commissioner's characterization of the Appellate Court's conclusion, but states that neither the respondent nor the Appellate Court opinion suggest that the department "would be required to expend the time and energy of reunifying, should a parent state unequivocally that he/she were unwilling to reunify or if a parent were so physically or mentally incapacitated" that reunification efforts would be futile.

make reasonable efforts to reunify before the trial court may find that a parent is unable or unwilling to benefit from such efforts is a question of statutory interpretation subject to plenary review. See *Gerlt* v. *Planning & Zoning Commission*, 290 Conn. 313, 320–21, 963 A.2d 31 (2009). This court reviews a "trial court's construction of the relevant statutory provisions de novo." *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 202, 937 A.2d 1184 (2008).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Donahue* v. *Veridiem, Inc.*, 291 Conn. 537, 547, 970 A.2d 630 (2009).

We begin, therefore, with the statutory language. As part of a termination of parental rights proceeding, § 17a-112 (j) (1) requires the department to prove by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, *unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts* . . . ." (Emphasis added.)

Because the two clauses are separated by the word "unless," this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively*, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly

provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element. Earlier and recent Appellate Court case law is in accord with this interpretation. See *In re S.D.*, 115 Conn. App. 111, 119–20, 972 A.2d 258 (2009) ("it was not necessary for the court to find that the department made reasonable efforts to locate the parent and to reunify the child with the parent, as § 17a-112 [j] [1] provides *that such finding is not required if the court . . . determines at trial . . . that such efforts are not required*" [emphasis added; internal quotation marks omitted]); *In re Shaiesha O.*, 93 Conn. App. 42, 47, 887 A.2d 415 (2006) ("[a] court need not make [a reasonable efforts] finding . . . if the evidence establishes that the parent is unable or unwilling to benefit from reunification efforts" [internal quotation marks omitted]); *In re Alexander T.*, 81 Conn. App. 668, 672, 841 A.2d 274 ("[§] 17[a]-112 [j] makes clear that the court must make a finding based on clear and convincing evidence that the department made reasonable efforts at reunification *or, in the alternative,* make a finding that the parent is unwilling or unable to benefit from reunification efforts" [emphasis added]), cert. denied, 268 Conn. 924, 848 A.2d 472 (2004).[13]

---

[13] Moreover, §§ 17a-111b and 17a-112 (j) (1), read together, make clear that each statute provides a separate avenue for a trial court to determine that reunification efforts are unnecessary. Section 17a-111b permits a court to find that "efforts are not appropriate" if any of the enumerated aggravated circumstances are present. In contrast, § 17a-112 (j) (1) excuses reunification efforts upon a finding that a "parent is unable or unwilling to benefit from reunification efforts *provided such finding is not required if the court has determined at a hearing pursuant to . . . section 17a-111b that such efforts are not appropriate . . . .*" (Emphasis added.)

Accordingly, the commissioner, upon filing a petition for termination of parental rights, faces a choice. If one of the aggravated circumstances enumerated in § 17a-111b is present, it may seek, at any time, an adjudication that reunification efforts are not required. In the absence of aggravated circumstances, the department must make reasonable reunification efforts until the petition is heard or, if it deems a parent unable or unwilling to benefit from such efforts, may either provide reunification services nevertheless or decline to do so. If the department declines to offer any services, however,

Thus, although § 17a-112 (j) begins with a presumptive obligation that the department make reasonable reunification efforts, it later excuses this obligation in cases in which a trial court finds, by clear and convincing evidence, that a parent is unable or unwilling to benefit from such reunification efforts. Consequently, to the extent that the Appellate Court's opinion can be understood as imposing a duty on the department to make reasonable efforts to reunify the respondent and Jorden prior to a court's determination that such efforts were unnecessary, the Appellate Court was mistaken. Such a requirement would be contrary to the clear and unambiguous statutory language permitting the trial court to excuse such efforts when a parent is unwilling or unable to benefit from them.

II

The commissioner next claims that the Appellate Court improperly concluded that the trial court's finding that the respondent was unable or unwilling to benefit from reunification efforts was clearly erroneous. After reviewing the record, we conclude that this issue was moot when it was presented to the Appellate Court because resolution of it in the respondent's favor could not have afforded her any practical relief. Consequently, the Appellate Court improperly addressed the issue on its merits, and this court similarly should not address a moot issue substantively. Because the Appellate Court incorrectly resolved an important question of public interest, however, we exercise our power to vacate the Appellate Court's judgment as to this issue. See *State* v. *Singleton*, 274 Conn. 426, 440, 876 A.2d 1 (2005).

As a threshold matter, we are compelled to conclude, sua sponte, that the Appellate Court lacked jurisdiction

it runs the risk that the trial court, upon hearing the termination petition, will deny it because it disagrees with the department's assessment that reunification efforts were not required because the parent is unable or unwilling to benefit from such efforts.

to review the respondent's claim in regard to § 17a-112 (j) (1) because her challenge to the trial court's findings as to this statutory element was incomplete, thereby rendering the issue she did raise moot. Compare *In re Ryan R.*, 102 Conn. App. 608, 618, 926 A.2d 690 (contesting both § 17a-112 [j] [1] findings on appeal), certs. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007). Specifically, the respondent in her appeal to the Appellate Court failed to challenge the trial court's finding that the department had made reasonable reunification efforts, a finding that provides an independent alternative basis for upholding the trial court's determination that the requirements of § 17a-112 (j) (1) had been satisfied.[14]

"Mootness raises the issue of a court's subject matter jurisdiction and is therefore appropriately considered even when not raised by one of the parties." *Lyon* v. *Jones*, 291 Conn. 384, 392, 968 A.2d 416 (2009). "Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction . . . . We begin with the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . .

[14] Although the respondent in her brief to the Appellate Court alluded to the department's reunification efforts as "merely half-hearted," she nevertheless failed to formally raise or fully brief a challenge to the trial court's finding that those efforts were reasonable. Consequently, the Appellate Court did not consider that issue. See *In re Jorden R.*, supra, 107 Conn. App. 17–18; see also *In re Melody L.*, 290 Conn. 131, 154, 962 A.2d 81 (2009) (appellate courts "are not required to review issues that have been improperly presented . . . through an inadequate brief" [internal quotation marks omitted]).

(3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) *that the determination of the controversy will result in practical relief to the complainant.*" (Emphasis added; internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 170, 962 A.2d 81 (2009). "[*I*]*t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow.*" (Emphasis added; internal quotation marks omitted.) *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996). "In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." *Hechtman* v. *Savitsky*, 62 Conn. App. 654, 659, 772 A.2d 673 (2001).

As we explained in part I of this opinion, § 17a-112 (j) (1) requires a trial court to find by clear and convincing evidence that the department made reasonable efforts to reunify a parent and child *unless* it finds instead that the parent is unable or unwilling to benefit from such efforts. In other words, either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1). In this case, however, the trial court found that both alternatives had been satisfied—the court found that the department had made reasonable efforts to reunify the respondent and Jorden *and* that the respondent was unwilling and unable to benefit from reunification services. Simply put, the trial court found that the department had provided the respondent with reunification services even though it had no duty to do so.[15]

---

[15] Although the department's provision of reunification services in conjunction with its allegation that the respondent was unable to benefit from them seems anomalous, it is understandable in light of the prescription of § 46b-129 (b) that specific steps for reunification shall be issued in conjunction with an order for temporary custody. In this case, the timing and nature of the various petitions filed by the commissioner led to the seemingly inconsistent findings of the trial court. In conjunction with the order of temporary custody, the court ordered specific steps for reunification, which the department commenced. After investigating Jorden's abuse more fully,

In light of the trial court's finding that the department had made reasonable efforts to reunify the respondent with Jorden and the respondent's failure to challenge that finding, the Appellate Court's decision, which disturbed only the trial court's finding that reunification efforts were not required, cannot benefit the respondent meaningfully. Despite the Appellate Court's holding, the trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remains unchallenged and intact.[16] In short, the Appellate Court's decision affords the respondent no practical relief. The Appellate Court should not have addressed the respondent's claim, but rather, should have declined to do so because it raised a moot issue.

Typically, this court would not address a moot issue substantively. In the present case, however, we find it appropriate to vacate the Appellate Court's decision as to this claim and briefly explain our reasoning so as to guide trial courts' future application of § 17a-112 (j) (1).

"Judicial precedents . . . should stand unless a court concludes that the public interest would be served by a vacatur." (Internal quotation marks omitted.) *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U.S. 18, 26, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994).

however, and failing to receive an adequate explanation from the parents for his catastrophic injuries, the commissioner filed the termination petition alleging that reunification efforts were unnecessary. The department nevertheless continued to provide the services ordered pursuant to § 46b-129 (b) until the termination petition was heard. See footnote 13 of this opinion.

[16] Although the Appellate Court's opinion discussed the fact that the department provided reunification services; see, e.g., *In re Jorden R.*, supra, 107 Conn. App. 28; it failed to acknowledge the trial court's finding that those services constituted reasonable reunification efforts. That finding unambiguously was made, as evidenced by both the trial court's memorandum of decision and its completion of the standard order form terminating the respondent's parental rights. On that order form, the box indicating a finding that reasonable efforts to reunify had been made is checked off, in addition to the box indicating a finding that the respondent is unable or unwilling to benefit from reunification efforts.

"[V]acatur is appropriate when it is in the public interest to prevent a judgment, otherwise unreviewable because of mootness, from spawning legal consequences." *State* v. *Singleton*, supra, 274 Conn. 440. Although our law of vacatur is scanty, we have vacated moot appeals relating to termination of parental rights on multiple occasions in service of the public interest. See *In re Candace H.*, 259 Conn. 523, 526, 790 A.2d 1164 (2002); *In re Jessica M.*, 250 Conn. 747, 748–49, 738 A.2d 1087 (1999).

When a court determines that it lacks subject matter jurisdiction to consider a claim, "any further discussion of the merits of that [claim] is dicta." *State* v. *Singleton*, supra, 274 Conn. 440. Nevertheless, "when we exercise our power to vacate a judgment in the public interest, we have the power to explain why we deem it necessary to do so. It is appropriate to exercise that power in the present case to make clear that the opinion of the Appellate Court should not be followed in future cases." Id. In short, we disagree with that court's conclusion that the trial court's finding that the respondent was unable or unwilling to benefit from reunification efforts was clearly erroneous.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 787, 952 A.2d 1280 (2008). "It is axiomatic that a trial court's factual findings are accorded great deference." *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, [an appellate court's] function is to determine whether a trial court's conclusion was factually

supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

Our review of the record discloses that there was ample evidence to support the trial court's finding that the respondent was unable or unwilling to benefit from reunification services and, therefore, the Appellate Court improperly concluded that that finding was clearly erroneous. More particularly, there was evidence to support the trial court's subsidiary findings that the respondent failed to comply meaningfully with the specific steps previously ordered by refusing to accept any responsibility for Jorden's injuries and by continuing to display immaturity and poor judgment. Additionally, the record is replete with evidence demonstrating the respondent's deception of those positioned to help her and, more importantly, her inability or unwillingness to take the steps necessary to protect Jorden. The court made its findings after observing the respondent during trial, listening to her testify, and considering the testimony of others. "The trial court, having heard the testimony and observed the witnesses, [is] in a position far superior to the [Appellate Court] to judge the evidentiary record as a whole." *Pagano* v. *Ippoliti*, 245 Conn. 640, 654, 716 A.2d 848 (1998).[17]

---

[17] The Appellate Court, in reversing the trial court's judgment, appeared to undertake its own assessment of the record evidence, crediting testimony that the trial court did not and affording it particular significance. See *In re Jorden R.*, supra, 107 Conn. App. 27–28. "It is well settled that [an appellate] court cannot find facts, nor, in the first instance, draw conclusions of facts from primary facts found, but can only review such findings to see whether they might legally, logically and reasonably be found." (Internal quotation marks omitted.) *Appliances, Inc.* v. *Yost*, 186 Conn. 673, 676–77,

The respondent's continued relationship with the father following Jorden's devastating injuries provided strong evidence of her poor judgment, immaturity and inability to benefit from reunification services. In this regard, the trial court found that, even if the respondent had complied facially with the court-ordered specific steps, her "sub rosa conduct [of maintaining that relationship] undermined all of the [reunification] services." According to the trial court, "[w]hatever gains were made in [the respondent's] counseling were entirely subverted by her own surreptitious involvement with [the father]." Although the Appellate Court acknowledged that the department had offered the respondent a range of services and that the respondent had undermined those services by secretly continuing to see the father following Jorden's injuries, it departed from the trial court in weighing the significance of the problematic relationship and drew different inferences from the relationship's continuation. The Appellate Court further disagreed with the trial court's finding that the severity of Jorden's injuries and the failure of the respondent to provide an adequate explanation justified the department's position that the respondent was unwilling and unable to benefit from reunification services. *In re Jorden R.*, supra, 107 Conn. App. 27–28.[18] We disagree with the Appellate Court's reasoning.

443 A.2d 486 (1982). The Appellate Court also appeared to reweigh the evidence, emphasizing the respondent's surface compliance with the court-ordered specific steps, but minimizing the import of her secretive behavior in continuing her relationship with the father. See *In re Jorden R.*, supra, 28.

[18] The Appellate Court relied heavily on *In re Vincent B.*, 73 Conn. App. 637, 644, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003), in deciding that the department had a continuing duty to provide the respondent with reunification services. *In re Jorden R.*, supra, 107 Conn. App. 26–28. There are significant differences between *In re Vincent B.* and the present case. First, unlike in *In re Vincent B.*, the department here did not deny the respondent reunification services. See *In re Vincent B.*, supra, 643. In fact, the department provided services throughout the termination process. Second, although the father in *In re Vincent B.* successfully completed a substance abuse program; id., 642; the respondent in the present case showed little gain in her counseling. More importantly, the respondent's

Although it never was established conclusively which parent had abused Jorden, the evidence suggested strongly that it was the father. There was evidence, however, that the respondent was aware that the father previously had abused Jorden physically, yet continued to leave the child in his father's care. A reasonable fact finder could conclude that the respondent declined to respond to a host of warning signs and carelessly exposed Jorden to the risk of severe physical harm. The father had physically abused the respondent in the past. The respondent knew of the father's illegal drug use and bad temper. Most importantly, she actually witnessed the father squeezing Jorden's head on multiple occasions, being rough with Jorden and closing the door when he was alone with Jorden. Despite these clear indications that Jorden was in peril, the respondent continued to leave him unattended with a dangerous individual. Moreover, the evidence showed that, even after Jorden had been severely injured and removed from the respondent's custody, she continued to exhibit poor judgment by secretly maintaining a relationship with the man she believed nearly had killed her baby and who continued to abuse her. The trial court, after hearing all of the evidence, concluded that the respondent "still has serious issues with domestic violence, her own self-esteem, her immaturity and her inability to protect herself, as well as her offspring. Until she resolves those issues she is at risk of entering another [abusive] relationship. . . . In the year following the life-threatening injuries to [Jorden], [she] has [not] made any meaningful progress [toward] resolving core personality deficits."[19]

own conduct undermined the services the department provided to her. Finally, the child in *In re Vincent B.* had not suffered unexplained catastrophic injuries while in his father's care. See id., 639.

[19] The trial court took particular note of the fact that the respondent engaged in what her therapist described as " 'magical thinking.' " The respondent's testimony at trial that the father was a "good father" bolsters the court's finding regarding her penchant for fantasizing.

In light of this evidence, the trial court's finding that the respondent bore some responsibility for Jorden's injuries, even if only as an enabler, was not clearly erroneous. If a parent continues to expose a child to the risk of serious physical injury by associating with a dangerous individual, after the child has been inflicted with a nonaccidental or inadequately explained serious physical injury while in the care of that individual, termination of the parent's rights may be warranted so as to protect the child. See, e.g., *In re Antonio M.*, 56 Conn. App. 534, 543, 744 A.2d 915 (2000) (upholding finding of commission/omission pursuant to § 17a-112 [j] [3] [C] and, ultimately, termination of parental rights when, inter alia, "respondent's failure to protect [her child] from the acts of her boyfriend and his own brother caused [her child's] physical and emotional injury"); *In re Lauren R.*, 49 Conn. App. 763, 771–72, 715 A.2d 822 (1998) (similar result, when respondent continued relationship with man who had molested her daughter); *In re Felicia D.*, 35 Conn. App. 490, 501, 646 A.2d 862 (similar result when respondent continually associated with men known to have abusive tendencies toward children in violation of court's protective orders; although respondent personally "did not inflict injury on her children, she had, despite warnings, exposed them to dangerous characters and failed to protect them"), cert. denied, 231 Conn. 931, 649 A.2d 253 (1994).[20]

---

[20] Courts also have relied on evidence that parents have continued to associate with dangerous third parties in determining that the parents have failed to rehabilitate as contemplated by § 17a-112 (j) (3) (B). See, e.g., *In re Alejandro L.*, 91 Conn. App. 248, 254, 261, 881 A.2d 450 (2005) (considering, inter alia, respondent's inability to sever violent relationship with father of her children despite department's offer of housing assistance and domestic violence prevention services and advice of drug counselors that relationship was impediment to obtaining and maintaining sobriety); *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001) (approving trial court's reliance on respondent's "failure to reside in a drug free environment [apart from child's father], despite her success in overcoming her own drug habit"); *In re Jessica B.*, 50 Conn. App. 554, 561–65, 718 A.2d 997 (1998) (upholding

On the basis of the foregoing, we conclude that the trial court's finding that the respondent was unable and unwilling to benefit from reunification efforts was supported by the evidence and, therefore, was not clearly erroneous.[21]

### III

We last consider the commissioner's claim challenging the Appellate Court's conclusion that the trial court improperly excluded from evidence a psychological report and testimony of the respondent's evaluator. According to the commissioner, the trial court acted within its discretion in excluding the report and testimony. We agree.

The following additional facts and procedural history are relevant. Prior to the termination hearing, the court appointed David M. Mantell, a psychologist, to conduct psychological evaluations of both the respondent and the father. A single report prepared by Mantell included background information on both parents, the results of their psychological evaluations and Mantell's observations in regard to termination.

After being examined by Mantell, the respondent hired Ronald D. Anderson, a licensed clinical psychologist, to conduct another psychological examination of

termination of respondent's parental rights based, in part, on decision to live with spouse who abused her and had been convicted of risk of injury for sexually molesting child).

[21] We are mindful of the fact that Jorden's special needs are ongoing. The trial court found: "[He] is still well behind in his developmental milestones. He has suffered a traumatic brain injury. He is neurologically impaired. The issue of Jorden's possible mental retardation cannot yet be assessed. He is at risk of cerebral palsy." The trial court found further that "Jorden is an infant with prodigious medical issues that will tax the skill, patience and judgment of a mature caretaker" and that the respondent was incapable of providing the "[p]ermanency, consistency, affection and stability [that] are crucial for [him]" or the "mature care that this special needs child will [require] throughout his life."

her. Without first consulting the trial court, the respondent gave Anderson a copy of the report prepared by Mantell. Anderson viewed Mantell's report, examined the respondent and then prepared his own report. As part of that report, Anderson recommended, in short, that the department reunify the respondent with Jorden and provide her certain services. The respondent did not provide the father's counsel with a copy of the report prior to trial.

At trial, the respondent called Anderson as a witness, and his report was admitted into evidence. Although the father's counsel initially consented to the admission of the report, he objected when it became apparent from Anderson's testimony that Anderson, in preparing the report, had relied on material contained in Mantell's report, in particular, Mantell's observations as to the father. According to the father's counsel, the father had participated in Mantell's examination with the understanding that the results would remain "absolutely confidential, absent any order of the court." The father's counsel expressed his view that the admission of Anderson's testimony, without his having time to prepare, presented him with a "serious dilemma" and violated his client's privacy. The commissioner's counsel agreed that release of Mantell's report to Anderson, or even to the respondent, was highly irregular. Counsel for both the commissioner and the father argued further that access to Mantell's report likely had influenced all of Anderson's conclusions and that any testimony would be influenced similarly. The respondent's counsel, in responding to these arguments, suggested that if Anderson were permitted to testify, opposing counsel would have an opportunity to cross-examine him as to what he relied on in making his recommendations.

Upon voir dire by both parties, Anderson testified that he could speak about some aspects of his examination of the respondent without reference to the Mantell

report, particularly, what his testing had revealed in regard to her intellectual abilities and personality. Anderson conceded, however, that he could not have made the ultimate, specific recommendations in his report had he not first read Mantell's report. Upon further questioning, he conceded again that his recommendations were not entirely independent of the Mantell report.

After considering Anderson's voir dire testimony, the trial court precluded him from testifying further and excluded his report from evidence.[22] According to the court, "the whole proceeding regarding . . . Anderson's report was very irregular and not timely," such that opposing counsel was unable to respond effectively. Moreover, the court credited Anderson's testimony that his conclusions had been influenced by viewing Mantell's report.

The respondent challenged the trial court's ruling in her appeal to the Appellate Court. That court concluded that the trial court abused its discretion by "precluding

[22] The court relied on General Statutes § 52-146c and Practice Book § 32a-7 (b), which preclude disclosure of confidential materials without a court order or consent of the subject. Section 52-146c provides in relevant part: "(b) Except as provided in subsection (c) of this section, in . . . juvenile . . . proceedings, all communications shall be privileged and a psychologist shall not disclose any such communications unless the person or his authorized representative consents to waive the privilege and allow such disclosure. . . .

"(c) Consent of the person shall not be required for the disclosure of such person's communications:

"(1) If a judge finds that any person after having been informed that the communications would not be privileged, has made the communications to a psychologist in the course of a psychological examination ordered by the court, provided the communications shall be admissible only on issues involving the person's psychological condition . . . ." See also Practice Book § 32a-7 (b) ("[e]xcept as otherwise provided by statute, no material contained in the court record, including the social study, medical or clinical reports . . . may be copied or otherwise reproduced in written form in whole or in part by the parties or their counsel *without the express consent of the judicial authority*" [emphasis added]).

more evidence than was necessary to remedy the unauthorized disclosure." *In re Jorden R.*, supra, 107 Conn. App. 35. On appeal to this court, the commissioner argues that, under the circumstances presented, the trial court's exclusion of Anderson's report and testimony was within its discretion. We agree with the commissioner.

The standard of review applicable to evidentiary challenges is well established and highly deferential. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 532, 944 A.2d 947 (2008); see also *Mulrooney* v. *Wambolt*, 215 Conn. 211, 221, 575 A.2d 996 (1990) (decision on whether to impose sanction of excluding expert testimony within trial court's discretion).

In this case, the trial court's determination of whether to admit the evidence in question required a balancing of competing policy concerns, namely, the respondent's right to offer an opposing psychological viewpoint in the presentation of her case versus the father's right to privacy and the state's public policy, as established in statute and court rule, of keeping confidential any personal information disclosed in juvenile proceedings. Although a range of solutions are conceivable, we are not persuaded that the balance struck by the trial court constituted an abuse of discretion. The respondent's unauthorized disclosure of Mantell's report compromised the father's privacy and contravened state policy. Moreover, the failure to provide the father's counsel with Anderson's report prior to trial put him in the

difficult position of refuting the respondent's allegations regarding the father, as contained in that report, without adequate preparation. Additionally, Anderson conceded that the ultimate recommendations in his report were influenced by his viewing of the private information contained in Mantell's report.[23]

Under these circumstances, it is unclear whether the respondent's suggestion of allowing full cross-examination of Anderson, rather than excluding the evidence, would have remedied the particular dilemmas presented. Cross-examination would not have cured the privacy breach, but could have exacerbated it, and this court will not second-guess the trial court's determination, made following a firsthand assessment of Anderson's voir dire testimony, that the witness' opinions were tainted irremediably by his knowledge and consideration of confidential information. Additionally, because the father had not yet consented to the termination of his parental rights when the report was introduced, the danger of biased testimony, favoring the respondent at the father's expense and without the father's counsel having had adequate time to prepare a response, also was a legitimate concern.

Given the overall circumstances, we cannot conclude that the trial court abused its discretion in excluding Anderson's testimony and report. Consequently, the Appellate Court's conclusion to the contrary was improper.[24]

---

[23] Notably, the respondent's counsel did not request a continuance in which Anderson could have prepared a redacted report and recommendations that were not dependent on information contained in Mantell's report but on Anderson's personal observations alone.

[24] The Appellate Court relied on our decision in *In re David W.*, 254 Conn. 676, 691, 759 A.2d 89 (2000), to support its holding that the trial court exceeded its discretion by excluding Anderson's report and testimony instead of simply allowing cross-examination to uncover any bias. In that case, a court-appointed evaluator who already had prepared three reports made improper ex parte contact with the department prior to drafting his fourth and final report. Id. The trial court denied the respondents' motion

The judgment of the Appellate Court is reversed in part and vacated in part, and the case is remanded to that court with direction to address the respondent's claim that the trial court improperly found that termination was in the best interest of the child.

In this opinion the other justices concurred.

to strike the evaluator's expert testimony, reasoning that under the circumstances, impeachment through cross-examination provided a sufficient remedy. Id., 678. The Appellate Court reversed the trial court, concluding that a per se exclusionary rule should apply in cases of improper ex parte contact between the department and court-appointed evaluators. *In re David W.*, 52 Conn. App. 576, 589–90, 727 A.2d 264 (1999), rev'd, 254 Conn. 676, 759 A.2d 89 (2000).

This court reversed the Appellate Court's judgment, rejecting its conclusion that a per se rule of exclusion was appropriate and agreeing with the trial court that cross-examination provided a sufficient remedy. *In re David W.*, supra, 254 Conn. 691. In so doing, we repeatedly emphasized that there was no indication the ex parte contact had resulted in bias, which was evidenced strongly by the fact that the recommendations in the expert's final report were consistent with those in his prior three reports that predated the contact. Id., 689. More importantly, we recognized that in cases of potentially tainted evidence, the trial court is in the best position to "neutralize whatever prejudice or misconduct may arise"; id., 687; reiterated that its discretion in such situations is broad; id., 687–88; and "emphasize[d] that the determination of the proper remedy for such a conflict is within the sound discretion of the trial court. Thus, exclusion may be appropriate in some instances and not others, depending upon the facts presented." Id., 693; see also id., 689 ("cross-examination . . . is but one [option] that a trial court may consider within the bounds of its sound discretion").

The facts of the present case clearly are distinguishable from those of *In re David W.* First, in *In re David W.*, we emphasized the absence of any evident bias or prejudice relating to the expert's testimony. In this case, Anderson conceded that his conclusions had been influenced by his viewing of Mantell's report. Second, in *In re David W.*, the parties all were familiar with the expert witness and had notice that he was to testify at trial. Id., 692. In the present case, the contents of Anderson's report surprised the father's counsel at the eleventh hour, hindering his ability to respond adequately to protect his client's interests. Finally, and most importantly, in both *In re David W.* and the present appeal, our reversal of the Appellate Court's judgment is based on the same rationale—when a number of options are available to remedy an evidentiary impropriety, the trial court's choice should not be revisited in the absence of an abuse of discretion. Neither case involved such an abuse of discretion.