******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE ELIJAH C.*
(AC 38519)

DiPentima, C. J., and Beach and Flynn, Js.

*Argued February 29—officially released March 29, 2016***

(Appeal from Superior Court, judicial district of Windham, Child Protection Session at Willimantic, Hon. Francis J. Foley III, judge trial referee.)

*Matthew C. Eagan*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Michael S. Taylor*, assigned counsel, for the appellant (respondent mother).

*Michael Besso*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

DiPENTIMA, C. J. The respondent mother, Marquita C.,[1] appeals from the judgment of the trial court terminating her parental rights as to her son, Elijah C. On appeal, she raises and analyzes three issues to argue that the court erred in determining that the Department of Children and Families (department) made reasonable efforts to reunify her with Elijah. Specifically, the respondent claims that (1) the department failed to provide federally mandated services to reasonably accommodate her intellectual disabilities, (2) the department failed to follow a court order to continue certain reunification services, and (3) the department must provide services that allow intellectually disabled parents a reasonable opportunity to retain custody of their children as part of reasonable efforts to reunify. We dismiss the appeal for lack of jurisdiction as it is moot.

The record reveals the following procedural history. The court granted the petitioner, the Commissioner of Children and Families, an ex parte order of temporary custody of Elijah shortly after he was born. The petitioner filed a neglect petition on February 21, 2014, on the basis of the doctrine of predictive neglect as a result of the respondent's diminished cognitive abilities.[2] The order granting temporary custody of Elijah was sustained four days later.

The court, *Dyer, J.*, held a neglect trial on September 15, 2014. On October 2, 2014, the court adjudicated Elijah as neglected and ordered his care, custody, and guardianship committed to the petitioner. Additionally, the court ordered the department (1) to contact two state agencies to inquire about additional services for the respondent, (2) to ascertain from those agencies whether a group home existed where the respondent could potentially be reunified with Elijah and receive various forms of instruction, (3) to request the behavioral health center that was providing the respondent with psychotropic medications to conduct a medication management review, and (4) to file a written report with the court addressing various issues.

On November 4, 2014, the petitioner filed a motion for review of the permanency plan seeking to terminate the parental rights of the respondent. Judge Dyer held a trial on January 22, 2015, and six days later, the court issued its memorandum of decision. After considering the evidence presented, the court concluded that it was in the best interest of Elijah that the respondent be "afford[ed] . . . a limited period of additional time to pursue reunification efforts," namely, to continue with the services provided by the department. (Footnote omitted.) The time period, the court believed, "should not exceed six or seven months." Ultimately, the court rejected the department's permanency plan of termina-

tion of parental rights.

On February 24, 2015, the petitioner filed a petition pursuant to General Statutes § 17a-112 to terminate the parental rights of the respondent and Paul Y. See footnote 1 of this opinion. On September 8 and 10, 2015, the court, *Hon. Francis J. Foley III*, judge trial referee, held a hearing on the termination of parental rights petition.[3] On September 18, 2015, the court issued a comprehensive memorandum of decision. The court found by clear and convincing evidence that "[the department had] made reasonable efforts to reunify the child with [the respondent] . . . [and the respondent] is unable to benefit from reunification services." Consequently, the court terminated the parental rights of the respondent. This appeal followed.

The court's memorandum of decision from the termination hearing sets forth the following facts relevant to this appeal. Shortly after Elijah was born, the hospital personnel were concerned because the respondent "appeared to have cognitive limitations and serious mental health problems (schizophrenia) and that [the respondent] was reported to have poor judgment and no insight into parenting." Thus, the hospital contacted the department, who sent a social worker to observe the respondent and Elijah. The social worker concluded that the respondent could not care for Elijah because of the severity of her limitations.

The respondent's lengthy and exceptionally sad involvement in the child welfare system provides the context to the present appeal. The respondent was born prematurely, addicted to cocaine and alcohol, and suffered serious medical conditions. In April, 1989, the respondent was placed in foster care with Gwendolyn C. and her then husband. In 1993, Gwendolyn and her then husband adopted the respondent and another girl unrelated to the respondent. In 1994, the respondent's adoptive parents divorced. Between 1997 and 1999, Gwendolyn adopted three more children.

The respondent's childhood with Gwendolyn was difficult. Under her care, the respondent and the other children were "cruel[ly] discipline[d] . . . [by her] making them run up and down stairs, standing them on one leg with their arms outstretched holding a book in each arm, [and] beating the children with a stick and with a belt." In July, 2001, just prior to the respondent's thirteenth birthday, Gwendolyn abandoned three of her adoptive children, including the respondent, at the department's Meriden office. Gwendolyn explained that she could no longer care for the children. All three children were underweight, which lent credence to claims that Gwendolyn routinely withheld food from the children.

After being abandoned by Gwendolyn, the respondent remained in the custody of the petitioner as a

committed child for approximately six years. The respondent qualified for postmajority services through the Department of Developmental Services and the Department of Mental Health and Addiction Services. The department developed a postmajority plan in which both agencies were to provide the respondent with "life skills, vocational training, and supportive housing." The postmajority plan, however, never came to fruition because, prior to her nineteenth birthday, the respondent returned to Gwendolyn's care. The respondent resided with Gwendolyn for the next several years before cohabitating with Paul Y. After the respondent and Paul Y.'s relationship ended, she returned to Gwendolyn's home. Approximately four months later, Elijah was born.

The court's memorandum of decision also detailed the department's efforts to reunite Elijah with the respondent. It noted that the department offered the respondent case management services, three in-home visits per week with a parenting skills component, the opportunity to attend Elijah's medical visits by providing transportation, and services from two agencies to provide supervised visitation and training in basic childcare skills. Concerned that the respondent was "being overwhelmed with too many services," the department sought and was granted permission for the respondent to undergo psychological evaluations.

The respondent underwent two psychological evaluations that informed the court's decision. The first evaluation, conducted by Madeleine Leveille, a licensed psychologist, was completed in August, 2014, prior to the neglect trial. In addition to providing the court with the respondent's background, Leveille's evaluation made key observations and opinions. For example, when discussing her mental illness, the respondent told Leveille that she regularly saw a "shadow," which Leveille characterized as a visual hallucination. Leveille concluded that the respondent had a "limited conceptual understanding, [was] highly dependent socially on others, and [had] odd and occasionally paranoid and cynical thought processes." Moreover, the respondent's "thinking processes show[ed] clear evidence of her [i]ntellectual [d]isability, [s]chizophrenia and a mood disorder." Leveille was unequivocal that "[h]aving an [i]ntellectual [d]isability does not mean that one cannot parent a child. In [the respondent's] case, however, her intellectual disability, coupled with her psychiatric conditions, particularly her personality disorder, render her incapable of parenting a child independently."

Approximately two months before the termination trial, in July, 2015, the respondent underwent a second evaluation. This evaluation was funded by the department in an effort to assess the respondent on an "individualized basis." The "Cognitive/Adaptive Functioning Evaluation" was conducted by Stephanie Stein Leite, a

licensed psychologist. Leite concluded that the respondent had an intelligent quotient that placed her in the "[e]xtremely [l]ow range," i.e., at the "bottom [one] percentile of the [population] . . . ." Leite's evaluation also concluded that the respondent's personal and social skills, adaptive behavior, the ability to perform daily living skills by an individual were in the one percent range, i.e., "[ninety-nine percent] of the population [have] better adaptive functioning skills than does [the respondent]." Leite's assessment indicated that the respondent's "eating, dressing, and hygiene skills [were] commensurate with a six year old . . . [that] [s]he complete[d] household chores at the level of an eleven year old, and use[d] time, money, and communication tools at the level of a [thirteen] year old." In short, Leite's evaluation demonstrated that the respondent, pursuant to General Statutes § 1-1g,[4] was intellectually disabled. On the basis of these results, Leite opined that the respondent was "unlikely to be able to independently care for herself, which means she [would] not [be] able to care for her baby. Because many of [the respondent's poor adaptive skills were] rooted in her lower intellectual functioning, though she is educatable, the deficits are not, overall, likely to be responsive to remediation." Leite concluded that the respondent could only care for Elijah if the respondent was under someone's care.

On appeal, the respondent, in her main brief, argues that the "court erred in determining that [the department] made reasonable efforts to reunify where the department curtailed services and filed a petition to terminate [the respondent's] parental rights less than one month after being ordered by the court to allow [the respondent] more time to benefit from services." The respondent's second argument in her main brief is that the "court erred in determining that [the department] made reasonable efforts to reunify where the department failed to provide services that would reasonably accommodate [the respondent's] intellectual disabilities."

In response, the petitioner argues that the respondent's claim is moot. Specifically, the petitioner asserts that, because the respondent challenged only the court's finding that the department made a reasonable effort to reunify and did not explicitly challenge the finding that the respondent was unable to benefit from these services, her appeal is moot pursuant to *In re Jorden R.*, 293 Conn. 539, 979 A.2d 469 (2009). The respondent, in her reply brief, disagrees. She distills her argument as follows: "[The department's] decision to ignore the . . . court's January 28, 2015 [permanency plan] ruling that [the respondent] be given more time to continue to benefit from services already in place, to instead diminish the services it was providing, and to proceed with termination were unreasonable and made any finding that she was unable to benefit

from services clearly erroneous. At the [termination of parental rights] hearing, the . . . court had no way to know what progress the respondent would have made had Judge Dyer's order been followed." In support of her argument, the respondent points to seven sentences from her main brief. Consequently, the respondent argues, her claim is not moot. We agree with the petitioner that the appeal is moot for failing to adequately challenge the court's finding that the respondent was unable to benefit from the reunification services provided by the department.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction . . . . We begin with the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) *that the determination of the controversy will result in practical relief to the complainant. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . .* In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Jorden R.*, supra, 293 Conn. 555–56.

Because *In re Jorden R.* controls the outcome of this appeal, we find value in briefly reviewing the analysis of that case as set forth by our Supreme Court. The court in *In re Jorden R.* clarified that "[a]s part of a termination of parental rights proceeding, § 17a-112 (j) (1)[5] requires the department to prove by clear and convincing evidence that it has made reasonable efforts to locate the parent and to reunify the child with the parent, *unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . .*

"Because the two clauses are separated by the word unless, this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; footnote added; internal quotation marks omitted.) Id.,

552–53. As a result, our Supreme Court held that the statutory language § 17a-112 (j) (1) permits the "trial court to excuse [reasonable] efforts when a parent is unwilling or unable to benefit from them." Id., 554.

Having concluded that either finding, i.e., reasonable efforts to reunify a parent and child were made or that the parent is unwilling or unable to benefit from the reunification efforts, provided an independent basis for satisfying § 17a-112 (j) (1), our Supreme Court held that failing to challenge both findings rendered the appeal moot. Id., 557. In that case, the trial court found that the department had made reasonable efforts to reunify the respondent *and* found that the respondent was unwilling or unable to benefit from the reunification efforts. Id., 549. On appeal, the respondent had not challenged the court's finding that the department had made reasonable reunification efforts, "a finding that provide[d] an independent alternative basis for upholding the trial court's determination that the requirements of § 17a-112 (j) (1) had been satisfied." Id., 555. Our Supreme Court concluded that the respondent could not be afforded any practical relief because, by not challenging both findings, the "trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remain[ed] unchallenged and intact." Id., 557. Therefore, as contemplated by *In re Jorden R.*, when a court terminates parental rights on the basis of its findings that the department made reasonable efforts to reunify the parent with the child *and* that the parent was unwilling or unable to benefit from the reunification services, on appeal, the parent must "formally raise or fully brief a challenge"; id., 555 n.14; to *both* findings because either is an independent basis to terminate parental rights.

In the present case, the court found by clear and convincing evidence that the department (1) "made reasonable efforts to reunify the child with [the respondent]," *and* (2) "that [the respondent] is unable to benefit from reunification . . . ." In reviewing the respondent's statement of issues, we note that the court's first finding was clearly challenged by the respondent on appeal; the second finding was not. The respondent argues in her reply brief that seven sentences from her main brief challenge the court's second finding.[6] Although the respondent's main brief does use language suggesting a challenge to the court's second finding, the argument was far from complete, lacking legal authority and analysis. As a result, the respondent has failed to adequately brief any challenge of the court's second finding that she was unable to benefit from the reunification efforts. See *In re Kachainy C.*, 67 Conn. App. 401, 413, 787 A.2d 592 (2001).

Review of the respondent's challenge to the court's finding that the department made reasonable efforts to reunify Elijah with the respondent would be improper

because it cannot afford her any practical relief and, therefore, is moot. See *In re Jorden R.*, supra, 293 Conn. 556 ("[i]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow" [emphasis omitted; internal quotation marks omitted]); *In re Alison M.*, 127 Conn. App. 197, 206, 15 A.3d 194 (2011) (same). We conclude, on the basis of the controlling precedent from our Supreme Court, that the respondent's appeal from the court's judgment terminating her parental rights is moot because she failed to challenge the court's finding that she was unable to benefit from the reunification efforts. Accordingly, we decline to review her claim.

The appeal is dismissed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the full names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** March 29, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of Elijah's putative father, Paul Y., during the same proceedings. Paul Y., however, did not challenge the court's judgment. Accordingly, in this opinion, we refer to the mother alone as the respondent.

[2] "A finding of neglect is not necessarily predicated on actual harm, but can exist when there is a potential risk of neglect." *In re Brianna C.*, 98 Conn. App. 797, 802, 912 A.2d 505 (2006).

[3] Prior to the commencement of the hearing on the termination petition, the respondent filed a motion to transfer guardianship to Gwendolyn C., the respondent's adoptive mother. The court denied this motion and that ruling was not challenged on appeal.

[4] General Statutes § 1-1g provides: "(a) Except as otherwise provided by statute, 'intellectual disability' means a significant limitation in intellectual functioning existing concurrently with deficits in adaptive behavior that originated during the developmental period before eighteen years of age.

"(b) As used in subsection (a) of this section, 'significant limitation in intellectual functioning' means an intelligence quotient more than two standard deviations below the mean as measured by tests of general intellectual functioning that are individualized, standardized and clinically and culturally appropriate to the individual; and 'adaptive behavior' means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected for the individual's age and cultural group as measured by tests that are individualized, standardized and clinically and culturally appropriate to the individual."

[5] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a

petition filed by the Commissioner of Children and Families . . . .''

General Statutes § 17a-111b (a) provides in relevant part: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to . . . subsection (j) of section 17a-112 . . . .''

[6] We also note that these seven sentences were contained in a subparagraph entitled "The Trial Court's January 28, 2015 Ruling On the Petitioner's Permanency Plan Defined Reasonable Efforts,'' in the respondent's main brief.

---