******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ROBINSON, J., joins, dissenting. I am deeply troubled by the majority's decision to affirm the judgment of the Appellate Court, which upheld the trial court's termination of the parental rights of the respondent father, Matthew M. (father). The trial court found, by clear and convincing evidence, that the Department of Children and Families (department) had proven that "the level of rehabilitation achieved by the parents falls far short of that which would reasonably encourage the belief that at some future date either parent could assume a safe, reliable and responsible position in [Shane M.'s] life given his age and needs."[1] In making this finding, the court relied heavily on the report and testimony of Derek A. Franklin, a licensed clinical psychologist who conducted a psychological evaluation of the father on September 20 and 25, 2012, "[to] assist the court [in determining] the father's rehabilitative status now and in the foreseeable future to parent Shane."[2] The trial court deemed Franklin's report and testimony "highly credible" and agreed with his recommendation that the father's parental rights should be terminated because the recommendation was based on Franklin's "review of the history, the empirical data, and his findings that a number of concerns continue to persist, specifically [the] father's failure to continue with substance abuse treatment, his need for active monitoring and testing for drug abuse, his lack of insight in addressing his ongoing anger issues, his need for a comprehensive evaluation concerning his medication needs, and his failure to achieve sufficient personal rehabilitation after such an extensive period of time . . . ." In my view, however, Franklin's findings and recommendation were insufficient to support the trial court's conclusion. Franklin failed to consider several treatment programs that the father successfully completed during the preceding year for the purpose of complying with the specific steps, and, therefore, Franklin's findings and recommendation were based in part on outdated information that did not describe the father's condition at the time of the termination proceeding. In addition, Franklin failed to consult any of the substance abuse or mental health counselors who had been working with the father for the past several years and thus did not have the benefit of their opinions. Rather, Franklin relied on a series of department reports, some of which were outdated and did not describe the father's recent progress, and on a battery of personality tests that provided information regarding the general propensities of persons with similar results but no information regarding the father's actual behavior. Accordingly, to the extent the trial court found, on the basis of Franklin's findings and recommendation, that the father had failed to rehabilitate, its finding

was not supported by clear and convincing evidence because Franklin's conclusions were based in large part on generalized propensity information and a series of outdated department reports, and any remaining facts the trial court correctly found were insufficient to support the termination of the father's parental rights.

I first note that, under the newly clarified standard of review, we review the trial court's subordinate factual findings for clear error. Under this standard, "[a] finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, [our] function is to determine whether a trial court's conclusion was factually supported and legally correct." (Internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009). We review the trial court's ultimate conclusion as to whether a parent has failed to rehabilitate, however, to determine "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its findings." (Internal quotation marks omitted.) *In re Soncheray H.*, 42 Conn. App. 664, 668, 680 A.2d 1363, cert. denied, 239 Conn. 940, 684 A.2d 712 (1996). Under both standards, "we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." Id.; see also *In re Jorden R.*, supra, 559 ("every reasonable presumption is made in favor of the trial court's ruling" [internal quotation marks omitted]).

Turning to Franklin's specific findings, I begin with several general comments regarding the information on which Franklin relied. First, Franklin interviewed the father directly for only a little more than two hours.[3] In addition, Franklin observed the father during a forty minute supervised visit with Shane, as ordered by the court. Although Franklin also was in possession of the test results and other documentation provided by the department, I believe two hours and forty minutes of interacting with the father and observing him with Shane was an insufficient amount of time with the father to determine his rehabilitation status.

Second, Franklin testified that the results of several of the father's personality tests[4] discussed in Franklin's report did not necessarily describe the father but, rather, described the general propensities of persons with similar test results.[5] Thus, to the extent the interpretive section of Franklin's written report suggested that the propensities indicated by the test results described the father's actual conduct, there is no support for this conclusion.[6]

Third, the collateral data sources the department provided to Franklin consisted of eleven documents prepared by three different department social workers who

supervised the father's case from the summer of 2010 to September, 2012, but who never worked directly with the father as therapists or counselors. In addition, four of the eleven documents were prepared before the specific steps were ordered on November 19, 2010,[7] four other documents were prepared after the specific steps were ordered but more than one year before Franklin interviewed the father,[8] and, of the three remaining documents, two were prepared approximately ten months, and the other approximately three months, before Franklin interviewed the father.[9] The department thus provided Franklin with very little recent information regarding the father's rehabilitation progress at the time of the evaluation. Furthermore, Franklin stated in his written evaluation that the "most recent status report update that [he was] in receipt of from [the department was] dated July 6, 2011," almost fifteen months *before* Franklin's evaluation of the father in late September, 2012. This admission not only suggests that Franklin relied on outdated information, but raises the question of whether Franklin was aware of the status updates included in the three most recent department documents relating to the termination proceeding that were listed as collateral data sources in Franklin's report. See footnote 9 of this opinion.

Fourth, although the collateral data sources contained references to most of the father's substance abuse and mental health counselors, including Nancy Burgos, Charles Frazier, Lisa Sargis, and Rudolph Thomas, Franklin testified that he failed to speak with any of these counselors in order to learn firsthand about the father's progress and condition. In explaining this omission, Franklin stated that he was allowed to speak only to persons authorized by the department and that, if the names of the father's service providers were not included on the list of authorized persons, he made no effort to contact them.[10] He added that he typically called all service providers listed by the department when evaluations were requested, that he had done so in this case, and that none of his calls had been returned, although he was unable to remember the names of specific persons he had called. Franklin thus prepared his report without the input of a single service provider, many of whom gave testimony at the termination hearing in January, 2013, regarding the father's condition and progress that flatly contradicted Franklin's findings. Although the trial court neither credited nor discounted this testimony, it very likely would have influenced Franklin's report and recommendation, which the trial court cited multiple times in concluding that the state had satisfied its burden of proving the father's failure to rehabilitate by clear and convincing evidence.

In sum, I believe the foregoing limitations in Franklin's report resulted in findings by the trial court regarding the level of rehabilitation achieved by the father that were not supported by clear and convincing evi-

dence, and, therefore, "the trial court could [not] have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [finding]" that the father had failed to rehabilitate. *In re Soncheray H.*, supra, 42 Conn. App. 668. In the text that follows, I describe each of the concerns that, according to Franklin and the trial court, continued to persist at the time of Franklin's evaluation and that served as the basis for the termination of the father's parental rights. I then describe the conflicting testimony of the service providers, who worked with the father over a period of months and years, that casts doubt on the trial court's conclusion that the father had failed to rehabilitate.

## I

### SUBSTANCE ABUSE

The trial court found, on the basis of Franklin's report and testimony, that the father had been diagnosed with cannabis abuse and that the testing data suggested there was a "high potential for relapse" and for "continued use or cravings, which [would] need to be monitored and addressed." The court referred to test results obtained by Franklin and described in his report showing an elevation in the clinical domain of substance abuse and noted Franklin's opinion that testing profiles indicating evidence of "mood dysregulation exacerbated by anxiety" suggested that the father was likely to continue abusing substances to obtain emotional control and management of his anxiety. The trial court also cited Franklin's recommendation that the father should continue to be treated for substance abuse and "engage in substance abuse groups due to his concern that [the] father was actively using [drugs], as the clinical data suggest[ed] that, at [the] very minimum, he continue[d] to crave cannabis and, therefore, [was] subject to relapse." (Internal quotation marks omitted.) The court finally noted Franklin's recommendation that the father, in addition to participating in substance abuse groups, should be subject to "active monitoring and testing for drug abuse . . . ."

The trial court's findings regarding the father's substance abuse cravings and relapse potential, however, were clearly erroneous insofar as they applied to the father in September, 2012, because they were based on Franklin's description of the father's diagnosis of substance abuse in 2010 and 2011, and the general profile evidence in Franklin's report, which, as previously discussed, described the propensities of persons with test results similar to those of the father rather than the father's condition at the time of the termination proceeding. The finding in Franklin's report that the father refused to participate in recommended substance abuse counseling, which the trial court also relied on in concluding that he required additional treatment, was

likewise clearly erroneous because it contradicted the testimony of the father's substance abuse counselor.

Erica Cyr, a psychotherapist at Community Health Resources who evaluated the father for substance abuse on June 13, 2012, and was a witness for the department, testified that, although the father initially did not want to participate in recommended group therapy for substance abuse, he changed his mind within one week and attended thereafter on a regular basis. She ultimately counseled the father for twelve weeks, from the end of August to December, 2012, in order to address his mental health and substance abuse issues, and testified that three random urine screens for substance abuse were negative during that time, although she was aware of one positive hair test. She described the father as an active participant in the group who had a good understanding of substance abuse and that, as of January, 2013, she believed he was in remission and that no further treatment was necessary. The department's own witness thus indicated that, in late September, 2012, when Franklin was conducting his evaluation, the father was participating successfully in group therapy for substance abuse.

Franklin, however, did not have this information when he prepared his report because he failed to follow up on the calls he said he had made to the authorized persons on the department's list. Franklin specifically testified he did not speak with Cyr, did not recall if he had attempted to contact her, and was not aware of her opinion regarding the father's drug dependency issues when he conducted his evaluation. He nonetheless admitted it was "critical" and "absolutely important" to know how the father was doing in a drug treatment program in order to conduct a proper substance abuse evaluation. Accordingly, the trial court's finding, based on Franklin's report, that the father required additional substance abuse treatment because he was in danger of a potential relapse was clearly erroneous because it was not supported by clear and convincing evidence.

## II

## ANGER MANAGEMENT ISSUES

The trial court also relied on Franklin's findings regarding the father's anger management issues in concluding that he had failed to rehabilitate. The court stated: "Franklin diagnosed [the] father with attention deficit hyperactivity disorder [ADHD], generalized anxiety disorder, and cannabis abuse and antisocial traits. . . . Testing performed by . . . Franklin indicated elevations [in] the clinical domains of ADHD, anxiety, paranoia . . . antisocial [traits] and aggression. There was no evidence of a major depressive disorder, but there was sufficient evidence of mood dysregulation exacerbated by anxiety. Specifically, [d]omains tapping for anxiety suggest prominent worry. These worries may

be of such magnitude that concentration and attending are compromised. . . . Franklin also opined that [the] father scored in the clinically relevant range for paranoia. He is hypervigilant and closely monitors his environment for evidence that others are out to harm him. He is overly suspicious. [Psychological testing] indicate[s] hostility and mistrust [in] even close relationships. He is easily insulted and tends to hold grudges. Paranoia does not arise to a level of delusions. There is no evidence of auditory, visual or kinesthetic hallucinations or disturbance in thought content or processing. Domains . . . tapping for aggression are indicative of a short fuse, as he is quick to anger . . . . [H]e is more likely to use verbal reasoning than physical aggression. However, he may become frustrated easily and, when provoked, will not back down from confrontation. This may lead to physical acts of violence. He otherwise possesses adequate commonsense reasoning, and [his] judgment is situation specific. . . . Franklin further opined that [the] father was emotionally stable, but there was evidence to indicate that he may become hostile when under emotional duress.

"With regard to [the] father's mental illness . . . Franklin opined that [the] father's anxiety, mood dysregulations, and ADHD marginally impact his day-to-day functioning but that these are likely to be exacerbated under the weight of emotional and psychological distress. He recommended treatment for these issues . . . ." (Internal quotation marks omitted.)

Franklin's negative evaluation appears to be based entirely on the father's test results and thus does not describe the personality and behavioral characteristics that the father actually exhibited in September, 2012, but, rather, the propensities of persons with similar test results. In fact, testimony from the father's mental health counselors, who worked with him over a period of almost three years, indicates that, in September, 2012, and thereafter, he either did not display most of the characteristics described in Franklin's profile or gradually overcame them.

Burgos, a clinical social worker at Radiance Innovative Services (Radiance) who conducted mental health assessments and made recommendations regarding treatment, evaluated the father in September, 2010,[11] for mental health issues and diagnosed him with an adjustment disorder accompanied by mixed depression and anxiety. Burgos recommended that he participate in a parenting program and long-term therapy to address his "current life situation," adding that "[h]e was essentially in crisis in relation to his tumultuous relationship with [Shane's mother] and having a very difficult time coping, especially very nervous and anxious about the custody of [Shane]." She stated that ending the relationship with Shane's mother likely would resolve some of his mental health issues, which appeared to be "situa-

tional," and that the father had indicated to her that he had enjoyed, learned and profited from the parenting program.

Sargis, a clinical social worker at Radiance who was the father's counselor from May, 2011, through January, 2012, worked with him on problem solving skills, coping skills and relaxation techniques to reduce his level of anxiety. She testified that, after she got to know him, she concluded he was doing much better than she originally had believed because he was juggling two different jobs as well as coming to the counseling visits and attending parenting and domestic violence classes; in her view, this busy schedule would cause anxiety in any ordinary person. She acknowledged a concern regarding his impulse control upon learning of an incident at his grandparents' home in November, 2011, during which he had poured gasoline on their kitchen floor, and thus recommended that he continue to work on anger management and coping skills when she left for another position in January, 2012. She nonetheless concluded that the father was functioning in most areas of his life, had listened and responded positively to her suggestions regarding anger management and coping skills, felt remorse about the incident at his grandparents' home, and, as time went by, his anxiety seemed to subside. She also testified that he did not miss his appointments, would arrive on time, and was cooperative and open-minded.

Thomas, a social worker at Radiance who had been counseling the father since January, 2012, when Sargis left, and was continuing in that capacity when he testified at the termination hearing in January, 2013, also worked with the father in the parenting program for thirteen weeks. He testified that the father consistently attended and fully participated in the program and that he was nurturing and able to share his ideas about how to parent a child. Thomas stated that the department's goals for the father were to learn how to parent a young child, deal with substance abuse, obtain gainful employment, and resolve his anxiety issues. With respect to these goals, Thomas described the father as consistently employed and as having no hyperactivity issues. Thomas also testified that the father was doing well managing his anxiety, which no longer was a concern. He explained that the father could be stubborn and opinionated at times, but that was part of his personality and not a mark against him, especially because he could listen to and take advice. Thomas described the calming techniques that he had discussed with the father and then provided an example of how the father used them effectively, at Thomas' suggestion, in the course of obtaining a change in position at his workplace in order to avoid contact with a manager who was "getting on his nerves."

Finally, Frazier, a clinical social worker and the presi-

dent of Radiance who had worked with the father as a facilitator in a domestic violence group in 2011 through 2012, described him as anxious by nature because he was a person who wanted to do things quickly and to do the right thing, but that he did not see this quality as a negative. Frazier testified that the father always was cooperative and engaged during the twenty-four week program, which he completed in 2012, and that he voluntarily shared his perspective. He also was, for the most part, on time and attended most classes, although there were occasional conflicts with his two jobs. Frazier further testified that he always had believed the father's domestic violence risk was low and that he had changed over the course of the program from denying that he was an offender, at the beginning, to understanding that domestic violence covers a wide spectrum of behavior and recognizing that he had been an offender. Frazier testified that the father was using the skills he learned in the group and that he understood and demonstrated insight into how important a violence free environment is to children, as well as the adverse consequences for children who are exposed to violence. Frazier added that he had seen growth in the father's ability to manage impulsive behaviors and anxiety and to develop a long-term perspective in problem solving.

From this testimony, it is clear that the father's therapists and counselors, who had worked with him during the two years prior to Franklin's evaluation, believed that the father had made progress and no longer displayed a high level of anger or hostility when dealing with stressful situations. This was especially apparent from Frazier's testimony about the father's participation in the domestic violence program and from Thomas' testimony explaining how the father had resolved a stressful situation at his workplace in a constructive manner without overreacting. If Franklin had had the benefit of these observations by the father's therapists and counselors, his conclusions regarding the father's progress and his ultimate recommendation might have been quite different. Accordingly, the trial court's finding that the father continued to demonstrate a "lack of insight in addressing his ongoing anger issues," which was based on the report Franklin prepared without the benefit of consulting the father's service providers, was clearly erroneous because that finding was not supported by clear and convincing evidence.

### III

### MEDICATION NEEDS

The trial court also expressed concern regarding the father's refusal to participate in a comprehensive psychiatric evaluation to determine if medication was required to address his mental health issues. The trial court stated: "Notably, [Franklin] opined that it was imperative that [the] father be referred for a psychiatric consultation in light of his impulse control issues and

ADHD, and that would serve to identify medication that could be useful in ameliorating or managing his symptoms, and that, without medication, [the] father would most likely continue to have problems." Franklin's recommendation, however, was based on a single tentative comment by one of the father's prior therapists that never was repeated by any of his subsequent therapists or counselors. Rather, medication to control his mental health issues apparently became unnecessary based on the progress described by Thomas and Frazier in their testimony. See part II of this opinion.

As previously discussed, Burgos, the clinical social worker at Radiance who initially conducted a mental health evaluation of the father in September, 2010, before the specific steps were ordered, testified that she believed he required long-term therapy to address his "current life situation," meaning his "tumultuous relationship" with Shane's mother, and that ending the relationship with Shane's mother, which he had done at least one year prior to his interview with Franklin, very likely would resolve some of his mental health issues. Notably, Burgos did not recommend an evaluation for medication.

Thereafter, the only counselor who recommended possible medication was Sargis, who worked with the father in 2011, after Burgos left for another position. Sargis testified that she suggested *initially* that the father see a psychiatrist for a medical evaluation to cope with current stresses in his life, acknowledged a concern regarding his impulse control upon learning of the incident at his grandparents' home in November, 2011, and recommended that he continue to work on anger management and coping skills when she left for another job in January, 2012. Sargis also testified that she did not know if medication was required because she was not a psychiatrist and noted that the father seemed to be functioning well in most areas of his life. Under Thomas' guidance, the father's anxiety reportedly diminished. Thomas specifically testified that the father no longer had hyperactivity issues and that his anxiety no longer was a concern. Frazier also testified that the father had done well in his domestic violence class, was a low risk for violence, and had developed insight into his anger management issues. As a consequence, the trial court's findings, based on Franklin's report, that the father still had impulse control issues that required medication and that he most likely would continue to have problems managing his symptoms without medication were clearly erroneous because they were not supported by clear and convincing evidence from the father's therapists and counselors, each of whom had worked with him for many months and knew him far better than Franklin.

IV

FAILURE TO ACHIEVE SUFFICIENT

## REHABILITATION

The trial court ultimately agreed with Franklin's finding that the father had failed to achieve sufficient personal rehabilitation in the two years preceding the termination proceeding. Although the trial court did not provide more detail regarding the factors on which Franklin relied in making this finding, Franklin's report ended with a recommendation that the father's parental rights should be terminated because (1) he had not continued with substance abuse treatment, (2) he had not participated in the domestic violence classes he needed to manage his anger, and (3) the time required to address these concerns had long since passed. As previously discussed, however, the father did continue with group therapy for substance abuse, and his counselor, Cyr, testified that he was in remission and required no further treatment. Frazier also testified that the father had completed a twenty-four week domestic violence program in 2012, presented a low risk of violence, and was using the skills he had learned in the group in his daily life. Thomas likewise testified that the father had demonstrated growth and was doing well with his problem solving skills. Accordingly, two of the three major findings that provided the basis for Franklin's recommendation to terminate the father's parental rights and the trial court's ultimate conclusion that the father had failed to rehabilitate were clearly erroneous because they were not supported by clear and convincing evidence.

### V

### OUTSTANDING UNRESOLVED STEPS

One of the last persons to testify at the termination hearing in March, 2013, was Amita Patel, the most recent department social worker assigned to the father's case. In her report dated March 15, 2013, entitled "Amended Addendum to Social Study," she noted that the father had completed the group therapy program for substance abuse at Community Health Resources, that no further treatment was recommended, and that the results of an unsupervised urine screen on March 4, 2013, were negative. She also noted that the father had successfully completed the terms of his probation on February 10, 2013, although he had been issued a speeding ticket on February 6, 2013. She further stated that the father reported he would share childcare duties with his new wife upon reunification with his children and that he planned on using family members as backup caregivers. Patel stated that she had met the father's wife and that she maintained full-time employment, was willing to participate in a substance abuse evaluation and was confident in her parenting skills, as she had helped raise her godchild, nieces and nephews.

In her report and testimony, Patel stated that the department's recommendation to terminate the father's

parental rights came down to three as yet unsatisfied requirements, namely, taking a hair follicle test, participating in the psychiatric evaluation recommended by Franklin to determine his need for medication, and accepting a parent mentor during visitation to enhance his parenting skills. I do not believe, however, that the father's failure to comply with these three requirements could have led the trial court to reasonably conclude, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to establish that the father had "failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable period of time, considering the age and needs of [Shane], [he] would assume a responsible position in the life of [that] child."

The father's therapists and counselors did not agree with Franklin that the father continued to have serious anger management issues, which was the basis for Franklin's recommendation that the father undergo a psychiatric examination to determine his need for medication. Accordingly, this recommendation was not supported by clear and convincing evidence of such a need.

Next, although the father resisted having a parent mentor at the visitations, he stated that he would be open to a mentor if he should be reunited with his two children. The department's recommendation that the father be assisted by a parent mentor during the visitations was apparently based on a suggestion by one of the visitation supervisors that the father would "benefit" from "a parent aide or some parental guidance . . . ." This same supervisor, however, also reported that the father's visitations were going well.

Keva Noel, an independent consultant who worked for Radiance and supervised the father's visitation with Shane and Shane's younger brother from April, 2012, until the time she testified in January, 2013, described the father's interactions with Shane and his brother as "appropriate." She elaborated that, although the father sometimes became frustrated, he normally conducted himself with a calm demeanor and used a level tone of voice. Noel stated that the only recommendation she had made was during the summer of 2012, when she suggested that the father could benefit from a parent aide or some parental guidance during his visits because of the conflicting demands of two very young children of different ages. She nonetheless stated that the overall success of the visits had been good, the father had interacted well with Shane, the two had bonded, and the only improvement would be learning how to better attend to the two children simultaneously.

Thomas likewise gave positive testimony regarding the father and his parenting skills. He testified that, when the father attended the parenting program conducted by Thomas, the father was receptive and open to

parenting ideas, and that his own ideas were consistent with those discussed in the training program. Thomas also described the father as a "nurturing kind of person" and indicated that he would be interested in having follow-up visits with the father after reunification to assist with the transitioning process. Thomas added that the father's new wife was ready to support and help the father if he was reunified with his children.

Additional evidence regarding the father's parenting skills was provided by Shane's foster mother. She testified that she had been present during three of the father's supervised visits with Shane and that the visits went very well. In fact, she described the atmosphere as "like a birthday for Shane and also for the sibling," and stated that the father was "great" with the children. She also testified that, about one year earlier, the father had met the foster parents and Shane at a fast-food restaurant and that this occasion also went smoothly but that, two months later, a department social worker called and told the foster parents not to reach out to the father until further notice. She added that the father had given her a book with his voice, which Shane recognized as his father's voice, and that the father sent Shane gifts for Christmas and his birthday. Accordingly, although the father did not satisfy the department requirement of a parent mentor during his visitations with Shane, his resistance must be considered in light of other evidence indicating that he had a positive relationship and demonstrated appropriate parenting behavior with Shane, that his new wife was willing to assist him in parenting Shane, that he was willing to accept a mentor upon reunification and that Thomas had expressed interest in advising him on parenting issues should reunification occur.

The department's final unsatisfied requirement was the hair follicle test. Although the father refused this test and gave different excuses for doing so, his most recent excuse was that his attorney had advised him not to take it.

In conclusion, because there appears to be no basis for the psychiatric evaluation to determine the father's medication requirements, and because the father agreed to a parent mentor should the department order reunification, I believe the only remaining department requirement that has not been satisfied is the hair follicle test. Accordingly, the father's failure to complete these three requirements does not, in my view, satisfy the standard that "the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the *cumulative effect of the evidence* was sufficient to justify its" determination that the father failed to achieve the level of rehabilitation required to reunify with Shane. (Emphasis added.) *In re Soncheray H.*, supra, 42 Conn. App. 668.

THE MAJORITY OPINION

Given the deficiencies in Franklin's evaluation of the father, including Franklin's failure to consider the testimony of the father's service providers in making his findings and recommendation, I disagree with the majority that the trial court properly determined, largely on the basis of Franklin's report, that the father could not achieve the level of rehabilitation required by the department in the reasonably foreseeable future.

In concluding that the father failed to rehabilitate, the majority relies on evidence regarding the father's conduct prior to November 24, 2010, including the car seat incident, several protective orders for domestic violence involving Shane's mother, and the father's arrest for breach of the peace resulting from his attempt to break down the door to the home of Shane's mother. This evidence, however, describes the father's conduct *before* the specific steps were ordered and, therefore, has no relevance except as a baseline against which to measure his future rehabilitation.

The remaining evidence on which the majority relies appears to be based on department reports concerning events in 2011, including the incident at the home of the father's grandparents and an arrest that was not reported to the department for possession of a controlled substance. The incident at the grandparents' home, during which the father poured gasoline on the kitchen floor and threatened but did not light or attempt to light a fire, resulted in a charge of disorderly conduct, a protective order between the father and his grandfather, and a sentence of three months incarceration, execution suspended, and one year of probation. Notably, the father subsequently expressed his remorse to Sargis and successfully completed his probation on February 10, 2013. He also successfully completed a twelve week domestic violence program with Frazier, who testified that the father was a low risk for violence, had come to accept that he had been an offender, and had demonstrated insight and growth. Thomas further reported that he believed the father no longer had any hyperactivity or anxiety issues and had learned how to use various calming techniques for dealing with stressful situations. Thomas added that the father and his grandfather now have a better relationship and that the father and his grandmother were still close. Nevertheless, neither Franklin nor the trial court marshaled and cited this evidence relating to the father's rehabilitation efforts and achievements following the gasoline pouring incident to assess what he had accomplished.

The only negative event on which the majority relies that occurred in 2012 was the father's refusal to take the single positive hair follicle test. Yet the majority concludes that "the [father] fail[ed] to continue with substance abuse treatment . . . [needed] active moni-

toring and testing for drug abuse . . . [lacked] insight in addressing his ongoing anger issues . . . [needed] a comprehensive evaluation concerning his medication needs, and . . . [failed] to achieve sufficient personal rehabilitation after such an extensive period of time . . . .'' (Internal quotation marks omitted.) This quoted material is taken directly from the trial court's memorandum of decision, which is subject to the flaws discussed in this opinion. Accordingly, I would conclude that, in light of the testimony provided by the father's therapists and counselors, and the lack of any further incidents of major concern during the year or more prior to the termination proceeding, the trial court's determination that the father had failed to rehabilitate was not reasonable in light of the entire evidence. I also would conclude that the remaining evidence of the father's refusal to take another hair test and to accept a parent mentor at his visitations, given that he was willing to accept a mentor and further counseling if he should be reunited with Shane, was insufficient to conclude that the level of rehabilitation the father achieved fell short of that which would reasonably encourage a belief that, at some future date, the father could assume a responsible position in Shane's life.[12] See, e.g., *In re Elvin G.*, 310 Conn. 485, 507, 78 A.3d 797 (2013). Thus, I believe this court should reverse the judgment of the Appellate Court and remand the case with direction to reverse the judgment of the trial court terminating the father's parental rights.[13]

Accordingly, I respectfully dissent.

[1] "We previously have explained that [p]ersonal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [General Statutes § 17a-112 (j) (3) (B) (ii)] does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 507, 78 A.3d 797 (2013).

[2] The evaluation was conducted pursuant to a court order issued in response to the department's motion dated August 8, 2012, requesting a psychological evaluation of Shane's mother and the father pursuant to General Statutes § 45a-717 (d). The motion stated in relevant part: "[T]he [department] . . . hereby requests that [the] . . . court order a . . . clinical evaluation of the father with parent-child interactions. . . .

"The department filed a termination of parental rights petition in November, 2011. The parents' mental health has repeatedly been a presenting child protection issue in addition to substance abuse, transience, and criminal activity. . . .

"The father is . . . diagnosed with substance abuse and mental health issues. . . . A full clinical assessment will assist the court to determine the father's rehabilitative status now and in the foreseeable future to parent Shane. . . .

"Wherefore, the department requests that the court order the psychological evaluation as requested."

The trial court granted the motion and ordered the psychological evaluation on August 21, 2012.

[3] Franklin testified that he spent a total of five hours with the father, during two of which the father was taking tests by himself. Franklin also observed the father and Shane during a forty minute supervised visit, thus leaving slightly more than two hours to conduct a one-on-one interview with the father.

[4] Franklin administered one intelligence test, four mental status and personality tests, and one substance abuse test.

[5] The following colloquy took place during the father's counsel's cross-examination of Franklin:

"[The Father's Counsel]: You say . . . [in] your report . . . drug usage has created considerable problems in interpersonal relationships, work performance may have been compromised in the past. On what basis do you make that comment?

"[Franklin]: The personality portion of the evaluation is not based on an opinion. So what you are repeating here is not my opinion or, in fact, an interpretation. It's based on what the data [are] suggesting. So, if he has certain elevations with regard to drug usage or drug domain, the data [are] suggesting that individuals with similar kind[s] of profiles have this kind of propensity.

"[The Father's Counsel]: That's not what it says in this. It's under personality, so—

"[Franklin]: Right.

"[The Father's Counsel]: It does not say based on the data that this is—

"[Franklin]: No. It does say that. It says the results. If you look under it, that says he completed a personality assessment comprised of various instruments. Under that heading, all the data [are] related to those instruments. It's when you [get] to the summary questions where you start making interpretation[s] of what the data [are] indicating. So, what you are seeing on the personality and what you are seeing under the IQ score [are] data. For example, if you look at the last paragraph, it says domains for aggression are indicative of a short fuse. This is just data information.

"[The Father's Counsel]: You also say . . . [the father] scored in the clinically relevant range for paranoia. He is hypervigilant and closely monitors his environment for evidence that others are out to harm him. Now, that's based on a standardized test?

"[Franklin]: That's based again—I want to be clear. This is based on standardized tests, indicates that individuals with similar profiles have this propensity. Now, having said that, when you go to the interpretive part, in the summary questions . . . I'm not talking about paranoia. I'm not talking about these issues. Now, what I am talking about when you look at this, you see how it manifests itself. So, he can be overly suspicious. Sometimes he has problems with interpersonal relationships. But there is certainly no evidence of [a] psychiatric disorder or paranoia."

[6] In the interpretative section of his report, Franklin repeated verbatim much of the propensity data drawn from the test results, thereby suggesting that the father actually exhibited such propensities in his everyday life. For example, Franklin repeated in the interpretive section that "there is evidence of prominent paranoia which does not rise to a level of delusion." He also concluded, on the basis of the propensity data: "[The father] is hypervigilant and monitors his environment for evidence that others are out to harm him. This may often result in some level of hostility and mistrust of others. Anxiety and mood dysregulation are not debilitating, however, they are likely to impact on the quality of his relationships with others as he typically is hypervigilant, may [question] the motives of others and is highly suspicious with negative consequences." When cross-examined on these interpretive statements, however, Franklin stated: "There is nothing definitive in the record that suggests that he will do that. But the data [suggest] that people with this type of profile may do that." Franklin later added, when the father's counsel persisted by asking whether the statement on hostility was speculative: "Right. That's a speculation in that particular response."

[7] The four documents prepared before the initial specific steps were issued to the father consisted of: (1) "Summary of Facts Substantiating Neglect," dated August 11, 2010, prepared by Janet Feliciano, social worker; (2) "Social Study for Superior Court for Juvenile Matters," dated October 4, 2010, prepared by Stephanie Duncan, social worker; (3) "Status Report," dated November 3, 2010, prepared by Duncan; and (4) "Social Worker Affidavit," dated November 19, 2010, prepared by Duncan.

[8] The four documents prepared between thirteen and twenty-two months before Franklin interviewed the father consisted of: (1) "Addendum to Social Study for Superior Court for Juvenile Matters," dated January 5, 2011, pre-

pared by Stephanie Duncan, social worker; (2) "Status Report," dated April 18, 2011, prepared by Yolanda M. Leon, social worker; (3) "Status Report," dated July 6, 2011, prepared by Leon; and (4) "Study in Support of Motion to Review Permanency Plan," dated August 11, 2011, prepared by Leon.

[9] The remaining three documents were: (1) "Summary of Facts to Substantiate Petition for Termination of Parental Rights," dated November 23, 2011, prepared by Yolanda M. Leon, social worker; (2) "Social Study in Support of Termination of Parental Rights Petition," dated December 30, 2011, prepared by Leon; and (3) "Study in Support of Motion to Review Permanency Plan," dated July 2, 2012, prepared by Leon.

[10] Although it is unclear which names were on the list of authorized persons, Franklin could have sought permission from the department to speak to Burgos, Frazier, Sargis and Thomas, all of whose names appeared in the department documents and who were listed as collateral data sources, in order to obtain additional or more updated information.

[11] Burgos testified that she had conducted the assessment "a couple of years ago, give or take," but the trial court indicated in its memorandum of decision that the assessment had been conducted in September, 2010.

[12] The majority claims that I ignore testimony that strongly supports the trial court's conclusions, including testimony that the father refused to submit to a hair test, refused to have a parental aide during his visitations with Shane, and refused a psychiatric evaluation to determine his need for medication. To the contrary, I not only recognize this testimony, but explain why, when considered together with all of the other evidence, it does not satisfy the standard that "the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the *cumulative effect of the evidence* was sufficient to justify its" determination that the father failed to achieve the level of rehabilitation required to reunify with Shane. (Emphasis added.) *In re Soncheray H.*, supra, 42 Conn. App. 668. As for Frazier's testimony that the father appeared to be under the influence of marijuana during one or two of his counseling sessions in early 2012, this testimony is of questionable value. When further pressed, Frazier testified that the father denied being under the influence, there was no proof that he was under the influence, he was "lucid" and "able to articulate" during the session or sessions and, therefore, that Frazier could not be sure that the father in fact was under the influence. The majority thus overstates the value of this testimony, especially given the gravity of a parental rights termination proceeding.

[13] Because I would reverse the trial court's judgment on this evidentiary ground, I would not reach the issues of whether the trial court's findings fell within the scope of the court-ordered specific steps and whether the court was required to inform the father that his refusal to submit to a hair follicle test could result in an adverse inference that he was continuing to engage in substance abuse.