******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

IN RE PHOENIX A.*
(AC 44060)

Moll, Cradle and Lavery, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court terminating his parental rights with respect to his minor child. He claimed, inter alia, that the court erred by finding that he was unable or unwilling to benefit from reunification services provided by the Department of Children and Families pursuant to the statute (§ 17a-112 (j) (1)) that requires a trial court to find by clear and convincing evidence that the department made reasonable efforts to reunify a parent and child unless it finds, instead, that the parent is unable or unwilling to benefit from such efforts. The trial court also found, pursuant to § 17a-112 (j) (1), that reasonable efforts were made by the department to reunify the family. *Held*:

1. Because the respondent father, who did not challenge on appeal the trial court's finding that the department made reasonable efforts to reunify him and the minor child, challenged only one of the two separate and independent bases for upholding the court's determination that the requirements of § 17a-112 (j) (1) had been satisfied, there existed a separate and independent basis for upholding the court's determination, and, therefore, even if this court agreed with the father's claim, there was no practical relief that could be afforded to him; accordingly, the father's claim was dismissed as moot.

2. The trial court properly found, in light of the evidence presented at trial, that the respondent father had failed to achieve sufficient personal rehabilitation so as to encourage the belief that he could assume a responsible position in the life of the minor child within a reasonable time; the record contained sufficient evidence to support the court's conclusion that the petitioner, the Commissioner of Children and Families, had proven by clear and convincing evidence the alleged adjudicatory ground for termination of the respondent's parental rights in that the petitioner presented evidence that the respondent continued to struggle with substance abuse and mental health issues throughout the department's involvement, he had difficulty addressing the needs of the minor child during visits right up until the time of trial despite participating in several parenting education classes and he continued to engage in criminal behavior, including violations of a protective order obtained by the minor child's mother.

3. The trial court's determination that terminating the respondent father's parental rights was in the best interest of the minor child was not clearly erroneous, the abundant evidence in the record having supported the court's determination: the court found that the father continued to struggle with substance abuse issues throughout the department's involvement, had continuing involvement with the criminal justice system, and had remained unable to implement into his daily functioning the skills he had learned in the various programs in which he had participated; moreover, testimony was offered that the minor child needed a stable caregiver, the father would not be an appropriate caregiver and the minor child needed permanency and to know who his caregivers were; furthermore, testimony was offered that the minor child was happy with his foster parents, and that he had a very close relationship with them and was bonded with them.

Argued December 7, 2020—officially released February 22, 2021**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Litchfield at Torrington, Juvenile Matters, where the matter was tried to the

court, *Hon. Joseph W. Doherty*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Deanna S. Levine*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Rebecca Mayo Goodrich*, for the minor child.

*Opinion*

LAVERY, J. The respondent father, Ryan A.,[1] appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, Phoenix A. (Phoenix). On appeal, the respondent claims that the court erred by (1) finding that he was unable or unwilling to benefit from reunification services, (2) finding that he had failed to achieve a sufficient degree of personal rehabilitation, and (3) determining that termination of his parental rights was in the best interest of Phoenix. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history as set forth by the trial court in its memorandum of decision or as otherwise undisputed in the record. Phoenix was born to his parents, the respondent and Leann C., who had a tumultuous, toxic, and aggressive relationship. Leann C. obtained a protective order against the respondent on May 23, 2015. Despite there being a full protective order in place, the respondent continued to have contact with Leann C. He violated the protective order five times and was arrested for those violations on October 8, 2015, and November 14, 2015.

The Department of Children and Families (department) first became involved with the respondent and Leann C. in June, 2015, due to concerns with transiency, domestic violence, and unaddressed mental health issues. Phoenix came into the department's care by way of a ninety-six hour hold on November 18, 2015. On November 20, 2015, the petitioner, the Commissioner of Children and Families, initiated neglect proceedings. An order of temporary custody was granted by the court on November 25, 2015. In November, 2015, Phoenix was placed in foster care with his maternal grandmother, Norma C.

On July 20, 2016, Phoenix was adjudicated neglected and committed to the care and custody of the petitioner. The respondent also was issued court-ordered specific steps to facilitate reunification on that day. Specifically, the respondent was ordered, inter alia, to attend parenting counseling, submit to substance abuse evaluation and treatment, refrain from using illegal drugs, attend domestic violence programs, and refrain from getting involved with the criminal justice system. Although Phoenix initially resided with his grandmother, his grandmother made it clear that she wanted to maintain a grandmother type relationship with Phoenix, and that she would take care of him only until the department found a permanent placement for him. Accordingly, Phoenix was placed in a nonrelative foster home after approximately one year in his grandmother's care. Phoenix remained in this foster home during the pendency of his case, and his current foster parents have represented that they are willing to adopt him. While

in foster care, Phoenix began exhibiting concerning behaviors such as aggression toward the other children in his foster home. He struggled with self-regulation and often resorted to kicking, spitting, hitting, and throwing objects when he was upset. Extensive efforts often were required to get Phoenix "regulated" when he initiated this combative behavior. Due to Phoenix' behavioral issues, he was referred to individual therapy in September, 2017. Although Phoenix continued to exhibit aggressive and combative behavior while in foster care, Phoenix became closely bonded with his foster family and expressed a desire to stay with them.

While Phoenix was in foster care, the department referred the respondent to numerous services to work toward reunification. Specifically, the department referred the respondent to parenting education services, individual therapy, psychological evaluations, substance abuse treatment, and domestic violence programs. The respondent began participating in parenting education programs in 2016 at Klingberg Family Centers. Despite completing this program, however, the respondent briefly left Phoenix alone in the car while going into stores on two separate occasions when Phoenix was approximately one and one-half years old. The respondent then completed two series of parenting classes at Family Strides. Although the respondent made "significant progress" in the Family Strides program, Emil Renzullo, a caseworker at the program, expressed concerns about the respondent's vocalization of anger toward Patty Lorenzo, a social worker with the department. Renzullo notified the department about his concerns for Lorenzo's safety.

In 2018, the respondent received additional parenting education at Family and Children's Aid. After completing this program, the respondent started the Reunification and Therapeutic Family Time program (RTFT) on October 15, 2018. When the RTFT program ended, the program's providers did not recommend reunification due to concerns about the respondent's financial stability, his impulsivity, and his inability to safely parent Phoenix. The respondent was discharged from the program in February, 2019. Following his discharge from the program, the department did not recommend reunification due to inconsistencies in the respondent's emotional regulation, impulsivity, being emotionally affected when Phoenix began acting out during visits, financial instability, and unpredictability during visits.

After the RTFT program ended, the department referred the respondent to additional parenting education through The Guardian, LLC. The respondent participated in the program from March 2 to June 1, 2019. He was unsuccessfully discharged from the program for lack of progress and for poor achievement of treatment goals. For example, it was reported that the respondent did not implement modeled parenting skills, allowed

Phoenix to run the visits, and was unable to manage Phoenix and address his needs.

In June and July, 2019, the department referred the respondent to two new agencies for supervised visits. The respondent was able to arrange visits with Phoenix through Ahavah Family Services in August, 2019. During one of those visits, Phoenix began to spit on, hit, and bite the respondent. In response, the respondent covered Phoenix' mouth, forcibly held back his head, and covered Phoenix' head with his shirt. Consequently, the department remained concerned that the respondent did not understand and did not implement the parenting techniques being taught to him.

The department also referred the respondent to individual therapy and had him undergo several psychological evaluations throughout the case in order to address his needs. Jessica Caverly, a clinical psychologist, diagnosed the respondent with antisocial personality disorder, borderline personality traits, and moderate cannabis use disorder. When she conducted her first evaluation in March, 2016, she recommended that Phoenix remain in foster care because she felt that the respondent was not ready for reunification. Her recommendation was based on the respondent's significant mental health concerns, substance abuse concerns, and history of domestic violence.

To help address these issues, the respondent began individual therapy with Holly Varanelli, a licensed clinical social worker. While in therapy, the respondent worked on understanding the correlation between his past trauma and dysfunctional relationships, as well as "crisis" work focused on the respondent's criminal case and risk of incarceration. Varanelli reported that the respondent attended individual therapy on a consistent basis, and that they were working on helping him identify positive community supports. He also began treatment at the Dual Diagnosis Intensive Outpatient Program at Charlotte Hungerford Hospital in June, 2016. He started taking Rexulti daily as part of his treatment and reported feeling stable while on medication.

Caverly evaluated the respondent a second time in March, 2018. Her second evaluation focused on what progress, if any, the respondent had made, along with how Phoenix' mental health issues were progressing. At the time of the respondent's second evaluation, the respondent had been medicated for one year and he appeared more stable than at the time of the first evaluation. As a result, Caverly recommended reunification with close and careful observation from the department. She did state, however, that her recommendation would change to termination of the respondent's parental rights if the respondent was abusing substances or if he stopped taking his prescribed medications.

Following Caverly's second evaluation, the respon-

dent ceased taking his prescribed medication in July, 2018. Despite the therapy and parenting counseling that the respondent received, Jamie Piccoli, a caseworker for the department, reported that the respondent continued to have difficulty understanding the complexity of Phoenix' trauma and how it came to be. He always attributed Phoenix' trauma to someone else, such as Leann C., the department, or Phoenix' foster mother. He showed little progress in learning how to parent to Phoenix' needs, and continued to demonstrate poor judgment, impulsivity, and violent tendencies. For example, the respondent was arrested for shoplifting in November, 2018, and for breach of the peace and threatening in August, 2019.

The respondent also continued to have problems with substance abuse. The respondent admitted to smoking marijuana as an adolescent and that he used cocaine and became addicted to opiates after a snowboarding accident. He also reported that he smoked marijuana every day of his adult life. Due to the respondent's substance abuse issues, the department referred him for a substance abuse evaluation in December, 2015, with the McCall Foundation. After the respondent was put on probation for a June 17, 2016 conviction of two counts of violation of a protective order, he was also required to submit to random urine tests, substance evaluation and treatment, and to provide a medical marijuana certificate.

To comply with the conditions of his probation, the respondent participated in substance abuse treatment at the McCall Foundation and provided specimens bimonthly to the Office of Adult Probation. His urine specimens from July 9, 19, and 30, 2019, were determined to be "diluted," indicating that he drank a large amount of water prior to the test.[2] Because the specimens were diluted, the tests were rendered inconclusive. The respondent's specimen taken on August 9, 2019, was positive for marijuana. The positive test was considered an illegal use of marijuana in light of the respondent's lack of a valid medical marijuana card. Due to concerns regarding the respondent's ongoing substance abuse issues, Dawson recommended that the respondent submit to a hair toxicology screen. Sara Hodis, a social worker from the department, subsequently requested that the respondent schedule a hair test. The respondent, however, failed to comply with this request.

Finally, the department also referred the respondent to domestic violence programs due to concerns about his threatening behavior and violations of a protective order. The respondent had a history of violent behavior originating from before the department's involvement with Phoenix. Specifically, the respondent previously had been incarcerated for aggravated assault following an incident involving his mother in Pennsylvania. His

pattern of threatening behavior continued during his relationship with Leann C. and remained a concern while Phoenix was in the department's care. Leann C. obtained a protective order against the respondent on May 23, 2015, but the respondent violated it five times and consequently was arrested twice for his violations. As a result, the department referred the respondent to a domestic violence program at the McCall Center. The respondent participated in that program and later was enrolled in the Explorer Program at Catholic Charities, which was a twenty-six week domestic violence program.

Despite his participation in these domestic violence programs, the respondent continued to demonstrate intimidating and aggressive behavior throughout the case. During his time in the Family Strides parenting program, the respondent expressed anger toward Lorenzo, a social worker with the department. A caseworker from the program notified the department about the respondent's expressed anger toward Lorenzo out of concern for her safety. The respondent also became more frustrated as the reunification process continued, and often would become loud and verbally aggressive. Several service providers and employees of the department reported that the respondent was explosive. The department's concern about the respondent's aggression progressed to the point where a state police officer began attending the respondent's visits to the department's offices. Additionally, the respondent had ongoing involvement with the criminal justice system, as he was arrested in August, 2019, for breach of the peace and threatening.

On November 7, 2017, the petitioner filed a petition to terminate the parental rights of the respondent and Leann C. pursuant to General Statutes § 17a-112 (j) (3) (B) (i) for their failure to achieve a degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of Phoenix, they could each assume a responsible position in the life of Phoenix. Trial was held on August 26, August 27, and September 23, 2019. On the first day of trial, Leann C. was defaulted for failing to appear and the court rendered judgment terminating her parental rights as to Phoenix.[3] The petitioner then proceeded with the case against the respondent. On the first day of trial, Piccoli testified about her concerns with the respondent's progress. She testified that although the respondent had participated in various services to help achieve reunification, the department remained concerned about his ability to parent Phoenix. Specifically, she stated that the respondent still had difficulty understanding the complexity of Phoenix' trauma and showed little progress in learning how to parent to Phoenix' needs. Piccoli testified that although it is apparent that the respondent loves Phoenix and cares about him, Phoenix is a tough child to parent, and the respondent

had not shown the ability to understand and deal with his behavior appropriately. She also expressed concern over the respondent's failure to take his prescribed medication, as Caverly's June, 2018 recommendation for reunification was based on the fact that the respondent was medicated.

The June, 2018 recommendation for reunification was further explored on the second day of trial when Caverly testified. She testified that her recommendation would change to termination of parental rights if the respondent was abusing substances or was not medicated for his mental health issues. She further stated that it would not be safe to place Phoenix with the respondent if he was engaging in threatening behavior. She also testified that due to Phoenix' age, he needed a stable caregiver. A caregiver who had untreated mental health issues with continued significant legal involvement would be considered unstable and not an appropriate caregiver for Phoenix.

On January 21, 2020, the court issued its memorandum of decision and rendered judgment terminating the respondent's parental rights. In doing so, the court made extensive findings of fact and concluded that the petitioner had established that the adjudicatory ground of failure to rehabilitate for termination existed and that termination of the respondent's parental rights was in the best interest of Phoenix. From this judgment, the respondent now appeals.

We begin by setting forth the legal principles that govern our review. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Also, as part of the adjudicatory phase, the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . ." (Citation omitted; internal quotation marks omitted.) *In re Malachi E.*, 188 Conn. App. 426, 434, 204 A.3d 810 (2019).

"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [parent's] parental rights is not in the best interests of the child. In arriving

at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in . . . § [17a-112 (k)]." (Internal quotation marks omitted.) *In re Paul M.*, 154 Conn. App. 488, 494–95, 107 A.3d 552 (2014).

I

The respondent claims that the trial court improperly found that he was unable or unwilling to benefit from reunification services. Specifically, the respondent argues that the court's finding was erroneous because he has demonstrated a willingness to cooperate and engage in the services offered to him. In response, the petitioner argues that the respondent's claim is moot because he challenges only one of the two separate and independent bases for the court's finding that the petitioner has satisfied the reasonable efforts prong of § 17a-112 (j) (1). We agree with the petitioner.

We begin by setting forth established principles of law and the standard of review. "Mootness raises the issue of a court's subject matter jurisdiction . . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction . . . . We begin with the four part test for justiciability . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . [*I*]*t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow*. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Emphasis in original; internal quotation marks omitted.) *In re Natalia M.*, 190 Conn. App. 583, 587–88, 210 A.3d 682, cert. denied, 332 Conn. 912, 211 A.3d 71 (2019).

"Section 17a-112 (j) (1) requires a trial court to find by clear and convincing evidence that the department made reasonable efforts to reunify a parent and child *unless it finds instead* that the parent is unable or unwilling to benefit from such efforts. In other words, either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1)." (Emphasis in original; internal quotation marks omitted.) Id., 588. "Accordingly, the [petitioner] must prove *either* that [the department] has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112

(j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).

In the present case, the trial court found by clear and convincing evidence "that reasonable efforts were made by the department to reunify this family. [The department] made numerous, specific and repeated referrals to various service providers. [The department] made sufficient efforts to get [the respondent] to engage in counseling and parenting classes as well as substance abuse counseling. [The department] did all that was reasonably necessary to reunite this family." The court's determination that the department made reasonable efforts at reunification thus satisfied the element enumerated in § 17a-112 (j) (1). The respondent, however, does not challenge on appeal the court's finding on the reasonable efforts portion of § 17a-112 (j) (1). Because the respondent argues only that the court erred in finding that he was unable or unwilling to benefit from reunification services, even if we were to agree with his claim, the fact that there is a second independent basis for upholding the court's determination renders us unable to provide him with any practical relief with respect to this claim on appeal. See *In re Miracle C.*, 201 Conn. App. 598, 605–606,     A.3d     (2020) (dismissing appeal because court could offer respondent no relief when respondent challenged only one of two separate and independent bases for court's determination that requirements of § 17a-112 (j) (1) had been satisfied); *In re Daniel A.*, 150 Conn. App. 78, 98, 89 A.3d 1040 (declining to review respondent's claim that court erred in finding that he was unable or unwilling to benefit from reunification efforts because it was moot for same reason), cert. denied, 312 Conn. 911, 93 A.3d 593 (2014). We, therefore, dismiss as moot the respondent's claim that the court erred in finding that he was unable or unwilling to benefit from reunification services.

## II

The respondent next claims that the court erred by concluding that he had failed to achieve a sufficient degree of personal rehabilitation. Specifically, he argues that the court erred because the department failed to ensure that he was engaged in appropriate services to aid his reunification with Phoenix and that it never followed up with him to address any issues or concerns it had with his behavior, individual therapy, and medication management. In response, the petitioner contends that the department referred the respondent to appropriate services to address the issues impacting reunification and that he simply was unable to benefit enough from those services in order to reunify with Phoenix. We agree with the petitioner.

The legal principles that govern our review are well established. Section 17a-112 (j) (3) (B) (i) provides for the termination of parental rights when the child "has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." "The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life." (Internal quotation marks omitted.) *In re Brian P.*, 195 Conn. App. 558, 568, 226 A.3d 159, cert. denied, 335 Conn. 907, 226 A.3d 151 (2020). "Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) Id. "[The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) Id., 568–69.

"A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard,

we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 569.

In its memorandum of decision, the court found "by clear and convincing evidence that [the respondent] has not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, he will be in a position to assume parenting responsibilities for his child, Phoenix . . . ." In reaching this conclusion, the court noted that the respondent had failed to offer evidence to refute the allegations in the termination of parental rights petition regarding his long-time and recurring substance abuse issues and had failed to deny his criminal record or the multiple arrests for violations of a protective order. Although the court stated that the respondent had made efforts to achieve the requisite degree of rehabilitation, the court concluded that his efforts had not been successful, and that it had "little confidence that within a reasonable time [the respondent] will be able to assume a responsible role in the child's life." Accordingly, the court found that the petitioner had proven, by clear and convincing evidence, that the respondent had failed to rehabilitate pursuant to § 17a-112 (j) (3) (B).

There is abundant evidence in the record from which the court reasonably could have concluded that the respondent failed to achieve a sufficient degree of personal rehabilitation. As the court stated in its memorandum of decision, the respondent failed to offer any evidence refuting the allegation in the termination of parental rights petition regarding his recurring substance abuse issues. The undisputed evidence demonstrates that the respondent struggled with substance abuse issues throughout the department's involvement with Phoenix, with the respondent testing positive for marijuana as late as August, 2019, the month when trial began. It is also undisputed that the respondent had continuing involvement with the criminal justice system. The respondent was arrested for violations of a protective order on October 8 and November 14, 2015. He was also arrested for shoplifting in November, 2018, and for breach of the peace and threatening in August, 2019.

Moreover, although the respondent made progress in his efforts to achieve the requisite degree of rehabilitation that would allow him to reunify with Phoenix, the department still remained concerned about his ability to address Phoenix' needs. As Piccoli testified, Phoenix

is a difficult child to parent. He exhibits "emotional and verbal aggression," which has been attributed to "trauma and disrupted attachment." Although the respondent participated in numerous parenting education programs, Piccoli believed that the respondent showed little progress in learning how to parent Phoenix' needs. Piccoli testified, for example, that the respondent struggled to implement the skills he was being taught and had difficulty calming Phoenix down when Phoenix' behavior became escalated. He also left Phoenix in the car unattended on two separate occasions and was unsuccessfully discharged from a parenting program that he participated in a few months prior to trial for lack of progress and poor achievement of treatment goals. The respondent's difficulty with implementing the newly learned parenting skills became evident during an August, 2019 visit with Phoenix. During this visit, Phoenix was particularly out of control and became physically aggressive with the respondent. In response, the respondent forcibly attempted to restrain Phoenix by holding his forehead back and covering Phoenix' head with his shirt. This visit was ended early due to safety concerns between Phoenix and the respondent. The evidence presented at trial, therefore, indicated that the respondent still had difficulty with appropriately addressing Phoenix' needs.

The petitioner also presented evidence about the respondent's struggle with mental health issues throughout the department's involvement. Although the respondent underwent several psychological evaluations and participated in individual therapy to help address his mental health issues, he continued to have problems with his "emotional regulation . . . and his demonstration of unpredictability for Phoenix in visits" that had delayed the respondent from moving further along in the reunification process. He also ceased taking his prescribed medication in July, 2018. This is particularly notable, as Caverly's June, 2018 recommendation for reunification was based on the assumption that the respondent was not abusing substances and was medicated for his mental health issues. She testified that if the respondent was testing positive for substances that he was not prescribed or he was not taking his prescribed medication, her recommendation would change to termination of parental rights.

Construing the record before us in the manner most favorable to sustaining the judgment of the trial court, as we are obligated to do; see *In re Brian P.*, supra, 195 Conn. App. 569; we conclude that the record contains sufficient evidence to support the court's conclusion that the petitioner had proven by clear and convincing evidence the alleged adjudicatory ground for termination of the respondent's parental rights. As previously observed, "[i]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather

whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) Id., 568. Here, the petitioner presented evidence that the respondent continued to struggle with substance abuse and mental health issues throughout the department's involvement, and that he had difficulty addressing the needs of Phoenix during visits right up until the time of trial despite participating in several parenting education classes. He also continued to engage in criminal behavior, with arrests in November, 2018, and August, 2019. Accordingly, that evidence supports the court's determination that the respondent's efforts at rehabilitation had not been successful, and that he would be unable to assume a responsible role in Phoenix' life within a reasonable time.

The respondent's claims that the trial court erred in finding that he failed to rehabilitate are unavailing. First, the respondent appears to contend that the court based its finding that he failed to rehabilitate on the fact that he left Phoenix unattended in the car on two occasions, and failed to consider that he was able to engage in services following a second evaluation and further reunification efforts. To the contrary, however, it is clear from the court's memorandum of decision that it based its determination on the extensive evidence presented at trial concerning the respondent's substance abuse and mental health issues, continued involvement with the criminal justice system, and difficulty with appropriately addressing Phoenix' needs. The respondent's first argument is thus unpersuasive.

Second, the respondent claims that the petitioner failed to offer evidence that the department worked with his individual therapist to address any of its concerns about his behavior and that the department also failed to ensure that the respondent was engaged in proper medication management. The respondent, however, has failed to provide us with any authority for his proposition that the department was required to work with his therapist or to ensure that he was engaged in proper medication management, nor are we aware of any. Moreover, the department was not required to do everything possible to facilitate the respondent's rehabilitation. Cf. *In re Jah'za G.*, 141 Conn. App. 15, 31, 60 A.3d 392 (department required only to do everything reasonable, not everything possible, when attempting to reunify child with parents), cert. denied, 308 Conn. 926, 64 A.3d 329 (2013). Here, it is undisputed that the department referred the respondent to multiple services, including parenting education programs, individual therapy, substance abuse treatment, and domestic violence programs. We are thus satisfied that the department adequately referred the respondent to services to facilitate his rehabilitation. The respondent's claim, therefore, fails.

In light of the evidence presented at trial, we conclude that there was sufficient evidence to support the court's finding that the respondent failed to achieve sufficient personal rehabilitation so as to encourage the belief that he could assume a responsible position in the life of Phoenix within a reasonable time. Accordingly, we conclude that the court properly found that the respondent had failed to rehabilitate.

## III

Finally, the respondent claims that the court improperly found that termination of his parental rights was in the best interest of Phoenix. Specifically, the respondent argues that the court erred in so finding in light of his clear bond with Phoenix.[4] In response, the petitioner contends that the court properly found that terminating the respondent's parental rights was in Phoenix' best interest due to the evidence presented at trial concerning the respondent's failure to rehabilitate and Phoenix' needs for stability and permanency. We agree with the petitioner.

We are guided by the following relevant legal principles and the standard of review. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)] . . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Brian P.*, supra, 195 Conn. App. 579.

The court considered and made findings under each of the seven statutory factors of § 17a-112 (k) before determining, by clear and convincing evidence, that termination of the respondent's parental rights was in the best interest of Phoenix.[5] In the dispositional portion of its memorandum of decision, the court emphasized that the department referred the respondent to numerous services to facilitate his rehabilitation,

including referrals to substance abuse programs, domestic violence programs, individual therapy for his mental health issues, and parenting education programs. The court then found that, despite engaging in these services, the respondent continued to demonstrate controlling and intimidating behavior, as well as an inability to problem solve with managing daily stressors and caring for Phoenix, that he had failed to implement into his daily functioning what he had learned from the services in which he participated, and that he had been unable to stay out of the criminal justice system. Although the court noted that Phoenix appears to have enjoyed the time he spent with the respondent on supervised visits, the court also found that Phoenix has developed a bond with his foster family. Due to his age and needs, the court stated that Phoenix is dependent on responsible, nurturing caregivers who can provide a safe, stable environment and a consistent level of care and emotional availability. In light of these considerations, the court concluded that terminating the respondent's parental rights was in Phoenix' best interest.

Here, there is abundant evidence in the record to support the court's conclusion that it was in the best interest of Phoenix to terminate the respondent's parental rights. As discussed in part II of this opinion, the evidence presented at trial indicates that the respondent continued to struggle with substance abuse issues throughout the department's involvement, had continuing involvement with the criminal justice system, and had difficulty implementing the skills he learned at the various programs he attended. Caverly testified that Phoenix needs a stable caregiver, and that a caregiver who has significant, untreated mental health issues, is abusing substances, and has continued legal involvement would not be an appropriate caregiver. Moreover, Piccoli and Norma C. testified during trial about Phoenix' bond with his foster parents. Piccoli testified that Phoenix was happy with his foster parents, and that he would go to them if he needed comfort, and Norma C. testified that Phoenix has a "very close relationship" with his foster family and that he is "very bonded" with them.

The respondent contends that the court erred because he clearly has a relationship with Phoenix. Although it is apparent that the respondent loves and cares about Phoenix, that is not dispositive in determining whether termination was in Phoenix' best interest. "As this court has explained, the appellate courts of this state consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Yolanda V.*, 195 Conn. App. 334, 356, 224 A.3d 182 (2020). Here, the court found that the respondent remained unable to implement into his daily functioning

the skills he had learned in the various programs in which he had participated. Moreover, Caverly testified that Phoenix needs permanency and that it would be traumatic for him not to have it. She further testified that the current situation is very confusing to Phoenix, and that he "needs to know who his caregivers are and he needs to know that his needs are always going to be met." In light of these considerations, we conclude that the evidence in the record supports the court's determination that terminating the respondent's parental rights was in Phoenix' best interest, and that its determination was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

** February 22, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Because only the respondent father has appealed from the judgment terminating his parental rights; see footnote 3 of this opinion; our references in this opinion to the respondent are to the father.

[2] The respondent stated that these tests were diluted because he was working as a roofer during the summer and that his water intake increased as a result. Clarissa Dawson, the respondent's probation officer, testified during trial that his excuse did not make sense, as his urine test was conducted first thing in the morning.

[3] At the start of trial, counsel for Leann C. informed the court that Leann C. would not be attending because she had insisted that she was entitled to a jury trial, despite being advised multiple times that there was no such thing as a jury trial for termination of parental rights. Accordingly, the court entered a default against Leann C. Later that day, the court made oral findings on the termination of parental rights petition with regard to Leann C. The court found by clear and convincing evidence that the department had made reasonable efforts to reunite Phoenix with Leann C., that termination of her parental rights was in the best interest of Phoenix, and that Leann C. had failed to rehabilitate. The court directed the court monitor to produce a transcript of its oral findings for the court to sign in lieu of a written memorandum of decision. Leann C. has not appealed from the termination of her parental rights.

[4] The respondent also argues that the court erred in concluding that it was in Phoenix' best interest to terminate his parental rights because he is continuing to make progress with his rehabilitation. As discussed in part II of this opinion, however, we already have determined that the court did not err in concluding that the respondent had failed to achieve sufficient personal rehabilitation so as to encourage the belief that he could assume a responsible position in the life of Phoenix within a reasonable time. To the extent that the respondent is arguing that he should have been permitted more time to rehabilitate before his parental rights were terminated, we recently have noted that such an argument "is inconsistent with our Supreme Court's repeated recognition of the importance of permanency in children's lives." (Internal quotation marks omitted.) *In re Ja'La L.*, 201 Conn. App. 586, 596,      A.3d     (2020), citing *In re Davonta V.*, 285 Conn. 483, 494–95, 940 A.2d 733 (2008).

[5] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2)

whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

––––––––––––––––––––––––––––